UNITED STATES of America,
Plaintiff-Appellee,

v.

Richard D. ENRIGHT,
Defendant-Appellant.

No. 77–5239.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 8, 1978.

Decided June 20, 1978.

Rehearing Denied Aug. 8, 1978.

Miles A. Hurwitz, Hurwitz & Karp, Dearborn, Mich., for defendant-appellant.

James K. Robinson, U. S. Atty., Detroit, Mich., Howard Weintraub, T. George Gilinsky, John J. Klein, Washington, D. C., for plaintiff-appellee.

Before PECK, ENGEL and MERRITT, Circuit Judges.

ENGEL, Circuit Judge.

Richard Enright was convicted by a jury on three counts of a four-count indictment. Count 1 charged him with conspiracy to violate 18 U.S.C. § 1955 (1976), which prohibits the operation of certain illegal gambling businesses. Count 2 charged the substantive offense under Section 1955 by aiding and abetting in the operation of the business. Count 3 charged Enright with conspiracy to obstruct the enforcement of Michigan's gambling laws, in violation of 18 U.S.C. § 1511 (1976).[1]

Enright was the Chief of Police of the City of Ecorse, Michigan. The government's theory was that he used his position as police chief to protect a gambling operation in return for payoffs over a number of years. Four other police officers were indicted with Enright, as was the superintendent of the local Public Works Department of the city. Enright was tried alone after several of the co-defendants, including all of the other police officers, pleaded guilty or *nolo contendere.*

There was substantial and convincing proof to show that Augustus Carter, who appeared as the key government witness, ran a numbers racket out of his restaurant, the N & N Snack Shop, in Ecorse, between 1969 and 1974. The proofs showed that employees of the restaurant would accept wagers on the premises over the phone and that the restaurant was the control center for a large operation of bookmakers who took bets at other locations and reported them to the restaurant. An FBI investigation culminated in the execution of a search warrant of the premises and the seizure of betting slips and gambling paraphernalia. Carter testified on the government's behalf at trial, and further evidence was secured by one Charles Taylor, who worked in an undercover capacity in the police force and infiltrated the conspiracy. There was, in short, extensive evidence that a gambling operation existed and that there was a conspiracy within the police force in Ecorse to protect it. The foregoing facts are not seriously challenged on appeal. The principal controversy at trial and on appeal centers on the link between Enright and that conspiracy.

Perhaps the most damaging evidence of Enright's involvement was hearsay evidence in the form of a recorded conversation between Augustus Carter and Charles Taylor which took place during the course of the conspiracy. There Carter's explanation to Taylor of Enright's long-standing role in the conspiracy was clearly set forth. Equally damaging was hearsay evidence in the form of a recorded conversation on July 19, 1972 between Charles Taylor and James Jackson, in which the latter advised Taylor that he was paying Enright the sum of $125 a month for his cooperation. These recordings had to be admissible, if at all, under

---

1. Enright was acquitted on a fourth count charging him with seeking to persuade one Augustus Carter to give false testimony before a grand jury in violation of 18 U.S.C. § 1503 (1976).

the conspiracy exception to the hearsay rule.[2]

In *United States v. Mayes,* 512 F.2d 637 (6th Cir.), *cert. denied,* 422 U.S. 1008, 95 S.Ct. 2629, 45 L.Ed.2d 670 (1975), our circuit recognized what it conceived to be the majority rule of the circuits to the effect that the predicate for admission of the hearsay statement of a co-conspirator is the existence of a *"prima facie case"* of the conspiracy and of the defendant's connection with it. There, citing *South-East Coal Co. v. Consolidation Coal Co.,* 434 F.2d 767 (6th Cir. 1970), *cert. denied,* 402 U.S. 983, 91 S.Ct. 1662, 29 L.Ed.2d 149 (1971); *Carbo v. United States,* 314 F.2d 718 (9th Cir. 1963), and also *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), we held that a *prima facie* case

> is less than proof beyond a reasonable doubt; indeed, it is less than a preponderance. . . . Moreover, the prima facie case need not be established before the proffered hearsay may be admitted; the judge may admit it conditionally. It is sufficient if at the close of the government's proofs, a prima facie case of the conspiracy and the defendant's connection with it has been established by "independent or disassociated evidence."

*Id.* at 651. While *Mayes* was decided before adoption of the Federal Rules of Evidence, the *prima facie* test has continued to be cited approvingly in our circuit. *United States v. Woods,* 544 F.2d 242, 264 (6th Cir. 1976), *cert. denied,* 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977); *United States v. McManus,* 560 F.2d 747, 750 (6th Cir. 1977), *cert. denied,* 434 U.S. 1047, 98 S.Ct. 894, 54 L.Ed.2d 798 (1978). Neither opinion, however, expressly addressed the impact of the Federal Rules of Evidence upon our decision in *Mayes.* That issue is raised here.

Before the adoption of the Federal Rules of Evidence, the First Circuit, like our own, followed the rule that a co-conspirator's hearsay statements may be admitted if the government establishes a *prima facie* case by means of independent, non-hearsay evidence. *United States v. Johnson,* 467 F.2d 804 (1st Cir. 1972), *cert. denied,* 410 U.S. 909, 93 S.Ct. 963, 35 L.Ed.2d 270 (1973). However, in *United States v. Petrozziello,* 548 F.2d 20 (1st Cir. 1977), the court decided that the *prima facie* test was no longer valid in light of Rule 104(a), which provides:

> **Questions of admissibility generally.** Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges.

Focusing on the trial court's obligation to "determine" a preliminary question, Judge Coffin reasoned that the Rule imposes a greater duty upon the court than simply to satisfy itself that a *prima facie* case exists. Instead, the district court, as the trier of preliminary questions, must resolve by a preponderance of the evidence whether the government has demonstrated the existence of a conspiracy and the defendant's connection with it. 548 F.2d at 23. Only when this threshold burden has been met may the district court admit a co-conspirator's out-of-court statements as admissions against the defendant under Rule 802(d)(2)(E).

Enright urges us to reconsider our holding in *Mayes* in the light of *Petrozziello* and Rule 104.

While the parties agreed during trial that the *Mayes* test was controlling, Judge Churchill addressed the applicability of Rule 104, as construed by the First Circuit in *Petrozziello,* in an opinion denying a post-trial motion for judgment of acquittal or new trial. Although expressing a personal preference for the rule announced in *Petrozziello,* the trial judge declined to apply it "because I do not believe it is actually mandated by Fed.R.Evid. 104 and I consider *Mayes* to be a binding precedent."

---

**2.** More properly, the new Federal Rules of Evidence simply declare that the statements of co-conspirators in the course of and further-ance of a conspiracy are not hearsay. Fed.R. Evid. 801(d)(2)(E).

It is unclear whether Rule 104(a) or Rule 104(b) governs the admissibility of a co-conspirator's out-of-court statement. Although *Petrozziello* tacitly assumes that 104(a) applies, Judge Weinstein points out that Rule 104(b) may govern. 1 Weinstein's Evidence ¶ 104[05] at 104–39 to –40, 104–43 (1977). Rule 104(b) provides:

**Relevancy conditioned on fact.** When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.

Rejecting the reasoning of *Petrozziello,* the Fifth Circuit has concluded that 104(b) applies since the admissibility of the evidence "depends upon the fulfillment of a condition of fact"—that is, the existence of a conspiracy and the defendant's connection with it. *United States v. Ochoa,* 564 F.2d 1155, 1157 & n. 2 (5th Cir. 1977); *See United States v. Brown,* 555 F.2d 407, 423 nn. 38, 39 (5th Cir. 1977). In *Ochoa,* the Fifth Circuit reaffirmed its prior practice of admitting the evidence upon proof of a *prima facie* case.

The issue can be framed in terms of competency: whether the conspiracy and the defendant's participation in it render the hearsay declarations sufficiently reliable to merit admission. Considered in this light, the preliminary question is for the judge under 104(a) as are other hearsay rulings. *See* Advisory Committee Note to Rule 104(a). On the other hand, the issue can be couched in terms of relevancy: whether the declarant's statements are largely irrelevant unless the defendant and the declarant are joint members of a criminal enterprise. Weinstein, *supra,* ¶ 104[05] at 104–39 to –40.[3] While the difference has

substance in practice, the Rule itself provides no guidance and its history, like its text, is ambiguous.

■ On balance, we conclude that a fair reading of subsections (a) and (b) favors the construction that 104(a) should be applicable to the question of the admissibility of a co-conspirator's statements. The issue, as we see it, is more naturally that of admissibility of hearsay evidence than it is of the relevancy of the evidence sought to be admitted, particularly as relevancy is defined in Rule 401. The question seems to be more one of the basic reliability and fairness of admitting the evidence rather than a relevancy question of whether the evidence has any tendency to make a fact in issue more or less probable than it would be without that evidence. Fed.R.Evid. 401. We therefore decide that Rule 104(a) provides the proper basis for analyzing the preliminary question of admissibility of a co-conspirator's out-of-court statement.

Having found 104(a) to be more applicable, the problem of what standard to employ in determining the preliminary question is made somewhat easier. Rule 104(a) holds that the preliminary question is to be "determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges." In contrast, where the preliminary question is the issue of fulfillment of a condition of fact under 104(b), the court makes its determination "upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition."

■ We view the language of 104(b) as a classic restatement of the *prima facie* test. Since this language was not embodied in

**3.** While Judge Weinstein appears to assume that an analysis of the co-conspirator problem under the *prima facie* test of 104(b) would require an instruction to the jury, Weinstein, *supra,* ¶ 104[05] at 104–43, Dean McCormick's treatise would hold to the contrary. *See* McCormick on Evidence, § 53 at 124 & n. 97 (2d ed. 1972). Section 53 of McCormick's treatise is cited with approval in the Advisory Committee Notes to Rule 104. Likewise, the

Ninth Circuit in *Carbo v. United States,* 314 F.2d 718 (9th Cir. 1963), approves the practice of the court resolving the preliminary question by a *prima facie* test without requiring any instruction to the jury on the evidentiary question. McCormick and *Carbo* are consistent with the prior practice of our court. *United States v. Mitchell,* 556 F.2d 371, 377 (6th Cir. 1977); *Mayes, supra,* 512 F.2d at 651.

104(a), we are therefore led to the conclusion that the framers of 104(a), whatever else they may have intended, probably did not intend that the trial judge employ a *prima facie* test in resolving issues arising under that subsection. A determination under 104(a) is more demanding than a *prima facie* test and calls for the exercise of judicial fact-finding responsibilities by the trial judge, responsibilities which require him to evaluate both credibility and the weight of the evidence.[4] The authorities are, however, again divided over the precise standard of proof to be employed by the trial court in making a preliminary finding under Rule 104(a). Judge Weinstein's treatise advocates the employment of the reasonable doubt standard:

> The better practice would be to require a very high degree of proof before admitting the statement. Only if the court is itself convinced beyond a reasonable doubt—considering hearsay as well as non-hearsay evidence—of the conspiracy, defendant's membership, and that the statement was made in furtherance thereof, should it admit. . . . Most district courts apply, and as already suggested, the Courts of Appeals approve, a somewhat less rigorous standard. Exactly what their test is has not always been made clear. It seems perfectly apparent, however, that many trial courts require a firmer and more reassuring foundation for admissions by coconspirators than for other kinds of admissions.

Weinstein, *supra,* ¶ 104[05] at 104–44 (footnote omitted).

Weinstein's position is contrary to the preponderance of evidence test, which was first adopted by the First Circuit in *Petrozziello* and later followed by the Eighth Circuit in *United States v. Bell,* 573 F.2d 1040 (8th Cir. 1978). Given the foregoing choice, we strongly incline to the view expressed by Judge Coffin in *Petrozziello.* In *Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972), the Supreme Court ruled that constitutional standards were sufficiently met if the pre-admission determination of voluntariness of a confession by the trial judge was on the basis of the preponderance of the evidence before him. 404 U.S. at 488–89, 92 S.Ct. 619, expressly disapproving the use of a stricter standard of proof, *i. e.,* reasonable doubt, as a matter of federal supervisory power. *Id.* at 488 n. 16, 92 S.Ct. 619. More persuasively we note that the Supreme Court has never applied a reasonable doubt standard as the measure of proof in determining the preliminary question of admissibility of statements of a co-conspirator. *See United States v. Nixon,* 418 U.S. 683, 701 n. 14, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).

The preliminary question—the existence of a conspiracy and the defendant's participation in it—may also coincide with an ultimate question of fact for the jury if a conspiracy is charged in the indictment.[5] Nevertheless, the fact-finding responsibilities of the judge and jury are distinct. As Judge Coffin correctly noted in *Petrozziello,* the trial judge is ruling on the admissibility of evidence, not guilt or innocence, and should not be bound by the reasonable doubt standard which guides the jury's de-

---

4. With *Petrozziello,* we observe that retaining a *prima facie* test under 104(a) is unattractive in tending to broaden unduly the coconspirator exception where the trial judge is "not bound by the rules of evidence except those with respect to privileges." While our circuit's prior practice was to limit the trial court's consideration to evidence independent of a co-conspirator's statement, *Mayes, supra,* 512 F.2d at 651; *see Glasser v. United States,* 315 U.S. 60, 74–75, 62 S.Ct. 457, 86 L.Ed.2d 680 (1942); Rule 104(a) arguably permits the trial court to consider the very statement seeking admission in making its determination. *United States v. Martorano,* 557 F.2d 1, 12 (1st Cir. 1977), *cert.*

denied, 435 U.S. 922, 98 S.Ct. 1484, 55 L.Ed.2d 515 (1978); *Petrozziello, supra,* 548 F.2d at 23 & n. 2; Weinstein, *supra* ¶ 104[05] at 104–44; Bergman, *The Coconspirators' Exception: Defining the Standard of the Independent Evidence Test under the New Federal Rules of Evidence,* 5 Hofstra L.Rev. 99, 104–110 (1976). *But see United States v. Bell,* 573 F.2d 1040 (8th Cir. 1978).

5. We note, however, that a conspiracy need *not* be charged in order to introduce evidence under the co-conspirator exception. *See* Fed.R. Evid. 801(d)(2)(E).

liberation. 548 F.2d at 23. This same point was made in cases prior to the Federal Rules of Evidence. As the Ninth Circuit noted in *Carbo v. United States,* 314 F.2d 718, 737 (9th Cir. 1963):

> [W]e adopt in this situation the orthodox prevailing view of the allocation of functions between judge and jury, which assigns to the judge decisions upon preliminary questions of fact determinative of the admissibility of evidence challenged under technical evidentiary rules.
>
> \* \* \* \* \* \*
>
> The trial judge's finding on admissibility in no way restricts the jury's inquiry into guilt or innocence. (footnote omitted).

*Accord, United States v. Dennis,* 183 F.2d 201, 230–31 (2d Cir. 1950) (L. Hand, J.), *aff'd,* 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951); 11 Moore's Federal Practice, *supra,* § 104.13[5] at I–55; Weinstein, *supra,* ¶ 104[05] at 104–39.

■ In conclusion, therefore, we align ourselves both with the holding and the logic of the First Circuit in *Petrozziello*:

> Although the prima facie standard is no longer appropriate, we see no reason to require that conspiracy be proved beyond a reasonable doubt. That is the standard the jury will apply to the evidence as a whole. The judge is ruling on admissibility, not guilt or innocence; the government's burden need not be so great. *See Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); *but see* Weinstein's Evidence ¶ 104[05]. The ordinary civil standard is sufficient:

if it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy, the hearsay is admissible.

548 F.2d at 23. We believe that the ends of justice and the sense of the Rule itself are preserved by the First Circuit's construction.

■ Although we hold with the First Circuit that a preponderance rather than a *prima facie* standard is to be applied under Rule 104(a) to test the admissibility of a co-conspirator's out-of-court statements, we find also, like the First Circuit, that the trial court's use of the *prima facie* standard employed in *Mayes* was not plain error, especially where it was agreed to without any objection at the time. Its application of the *prima facie* test could be said to be neither unjust nor unreasonable, nor in the context of the facts before us did it result in any substantial disadvantage to the defendant.[6]

In fact, it appears that the trial court accorded Enright greater protection than he was entitled to under the prior law of our circuit, for he had the benefit of an instruction, taken substantially from E. Devitt & C. Blackmar, Federal Jury Practice and Instructions § 27.06 (3d ed. 1977), to the effect that the jury may consider a co-conspirator's hearsay statements only if the jury itself finds beyond a reasonable doubt that the conspiracy existed and that the defendant was one of the members.[7]

---

**6.** We conclude that the trial court was correct in its admission of the hearsay evidence under the law as it existed at the time of trial. Through the direct testimony of co-conspirator Carter and tape-recorded conversations with Enright made during the existence of the conspiracy, the government established by independent evidence a *prima facie* case of the existence of the conspiracy and Enright's participation in it. *Mayes, supra,* 512 F.2d at 651.

**7.** Judge Churchill charged the jury:

When it appears beyond a reasonable doubt from the evidence in the case that a conspiracy existed and that a defendant was one of the members, then the statements thereafter knowingly made and the acts thereafter knowingly done by any person likewise found to be a member may be considered by a jury as evidence in the case as to the defendant found to have been a member even though the statements and acts may have occurred in the absence and without the knowledge of the defendant, provided such statements and acts were knowingly made and done during the continuance of such conspiracy and in furtherance of the objectives or purposes of the conspiracy otherwise, any admission or incriminatory statement made or act done outside of court by one person may not be considered as evidence against any person who was not present and did not see and hear the statement made or done.

This type of instruction giving the defendant a "second bite at the apple," Weinstein, *supra*, ¶ 104[05] at 104–44, has been repeatedly held by our circuit to be altogether unnecessary. *United States v. Mitchell*, 556 F.2d 371, 377 (6th Cir. 1977); *United States v. Hoffa*, 349 F.2d 20, 41 (6th Cir. 1965), *aff'd*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); *see South-East Coal Co. v. Consolidation Coal Co., supra*, 434 F.2d at 778–79 (civil conspiracy). Criticizing a similar instruction, Judge Learned Hand observed:

It is not clear in the books that these instructions did not too much confine the jurors' use of the declarations, for it directed them not to regard them at all unless they were first convinced beyond reasonable doubt that the declarant and the defendants were engaged in a common venture which the declarations helped to realize. It is difficult to see what value the declarations could have as proof of the conspiracy, if before using them the jury had to be satisfied that the declarant and the accused were engaged in the conspiracy charged; for upon that hypothesis the declarations would merely serve to confirm what the jury had already decided. In strict logic these instructions in effect altogether withdrew the declarations from the jury, and it was idle to put them in at all. The law is indeed not wholly clear as to who must decide whether such a declaration may be used; but we think that the better doctrine is that the judge is always to decide, as concededly he generally must, any issues of fact on which the competence of evidence depends, and that, if he decides it to be competent, he is to leave it to the jury to use like any other evidence, without instructing them to consider it as proof only after they too have decided a preliminary issue which alone makes it competent. Indeed, it is a practical impossibility for laymen, and for that matter for most judges, to keep their minds in the isolated compartments that this requires.

*United States v. Dennis, supra*, 183 F.2d at 230–31.

We reaffirm our view that the trial court should have sole responsibility for ruling on the admissibility of evidence. Since our construction of Rule 104(a) expands the trial court's role and imposes the more stringent standard of a preponderance test, there is even less excuse for giving such a potentially confusing and internally inconsistent instruction to the jury, and we disapprove its use. In any event, its employment here operated as a windfall for Enright, since it gave him the benefit of the jury's consideration of admissibility.

## THE 1969 MEETINGS

The allegations in the three counts of the indictment upon which Enright was charged allege conduct "from on or about the 29th day of June, 1972, and continuously thereafter, up to and including the eleventh day of December 1974." Nevertheless, both the government and the trial judge relied upon a conversation which Carter testified he had with Enright in 1969 as independent evidence of Enright's participation in the conspiracy. The proofs, primarily testimony by Carter, were that in the fall of 1969, Carter met with Chief of Detectives Underwood, a co-defendant, who inquired about Carter's numbers business. Carter replied that he had quit working for one group of gamblers and had begun working for another. Underwood indicated that Carter would have to pay Superintendent of Public Works Garrett $150 a month and in return would "not be bothered in Ecorse" and would "get information if . . . other law enforcement [came] into town." Shortly thereafter, according to Carter, Enright arranged a meeting with him by leaving a message for Carter to contact him. Carter telephoned Enright, and they met that evening in a parking lot of the Outer Drive Hospital. Once there, the conversation turned to numbers and Enright asked Carter what he was doing in the numbers business. Carter responded by telling Enright that "he knew who to go see." The following day, still according to Carter, Enright and Underwood came by the Sportsman Cafe which Carter then owned. After chatting for some time

Carter stated that Enright shook his hand and said, "The meeting we had the other day, everything is okay."

The foregoing was used at trial as direct and independent evidence tending to show Enright's knowledge of and involvement in the conspiracy as far back as three years before the period alleged in the indictment. Subsequent recorded conversations between Carter and Enright, obtained within the period of the indictment, refer to the 1969 meetings and tend strongly to verify Enright's knowledge and complicity in the conspiracy. Nevertheless, Enright urges that proof of the 1969 conversations constituted inadmissible prior misconduct and that if such alleged conversations were part of the violations in the conspiracy charged in the indictment, then there was a variance between the indictment and the proofs which mandates reversal. We cannot agree.

■ Our circuit and several others have held that evidence of a conspirator's actions, even though they may have occurred before the beginning of the conspiracy alleged in the indictment, are nevertheless admissible as proof of motive or intent, touching upon the conspiracy charged in the indictment. *Wilson v. United States,* 109 F.2d 895, 896 (6th Cir. 1940); *Grayson v. United States,* 272 F. 553, 558 (6th Cir. 1921). Whatever would have been the right of other conspirators in a joint trial to object to the evidence, it was properly admitted against Enright as direct evidence involving him. Proof of the 1969 meetings between Carter and Enright clearly had relevance, especially to the issue of intent and to the understanding of the 1974 conversations between the same two men with respect to the FBI investigation then in progress.

■ Nor do we conceive that the employment of this evidence constituted a material variance between the proofs and the indictment. To constitute reversible error, the accused must either have been misled to his prejudice or have been exposed to the danger of double jeopardy. *Stone v. Wingo,* 416 F.2d 857, 864 (6th Cir. 1969). Here, Enright could not have been misled for he had ample advance notice of the proposed use of that testimony and access to the tapes of the 1974 conversations which made full reference to events in years past. There exists no danger of double jeopardy in any involvement in the conspiracy before 1972 because of the bar of the five-year statute of limitations, 18 U.S.C. § 3282 (1976).

## ADMISSIBILITY OF TAPE RECORDINGS

■ Objection was made to the introduction of certain tape-recorded conversations between Enright and Carter on October 2, 1974 and between Taylor and Jackson on July 19, 1972. The latter conversation was particularly damaging in that Jackson, himself a conspirator, stated to Taylor that he was paying Enright $125 a month. Generally the admission of tape recordings is committed to the discretion of the trial court. *United States v. Cooper,* 365 F.2d 246, 250 (6th Cir. 1966), *cert. denied,* 385 U.S. 1030, 87 S.Ct. 760, 17 L.Ed.2d 677 (1967). The record reveals that the court most carefully considered the objections that portions of the recording were inaudible, rendering the remainder thereof subject to being taken out of context. Our review of the record and of some of the tapes satisfies us that the trial judge carefully regulated the jury's consideration of the tapes. The question of admissibility of audible portions of the tape when certain portions are inaudible is addressed to the sound discretion of the trial court. *United States v. Howard,* 504 F.2d 1281, 1287 (8th Cir. 1974). Our review of the record and of the tapes satisfy us that that discretion was not abused here.[8]

8. Appellant's objection to a transcript of a portion of the tapes employed by the government on appeal is without merit. The transcript itself was not introduced into evidence and considered by the jury. While we do not believe that we are precluded from employing the government's transcripts when listening to the tapes themselves, we did in fact heed the admonition of defense counsel concerning the alleged inaccuracy in that record.

## THE BRADY ISSUE

As noted above, a recorded conversation between Jackson and Taylor indicated that Enright was currently being paid $125 a month for his forbearance. During the course of trial, the defense brought to the attention of the court the claim that Jackson, who had two weeks earlier entered a plea of guilty in the case, had allegedly made a statement in an interview with the United States Attorney in which he denied that he had ever paid any money to or for the benefit of Enright.

In the colloquy which followed, the government attorney acknowledged that Jackson had denied Enright's involvement:

MR. ZUCKERMAN: I interviewed Mr. Jackson. Mr. Jackson told me a lot of things. I was asking about his participation with Enright. He denied it. He is a very hard man to talk with and a very hard man to understand exactly what he was saying. He denied it yet he pled guilty.

THE COURT: He pled guilty not to giving money to Enright?

MR. ZUCKERMAN: To the gambling offense.

THE COURT: Yes.

MR. ZUCKERMAN: I don't think it was *Brady* material at the time. It's a conflict in evidence. It's not exculpatory.

\* \* \* \* \* \*

MR. ZUCKERMAN: There was no intention to hide anything. I had a lengthy interview with Mr. Jackson and at the end I wasn't quite sure what he was saying. I am never quite sure if he is telling the truth or not. If he had an interest to protect at that time I wasn't aware of it or didn't know about it. I just interviewed him and decided there was nothing of value I could give him as a witness. Obviously counsel is aware of the information.

■ Contrary to the assertion made by the government during the trial, we are fully satisfied that the fact of the retraction of a previously incriminating and inculpatory statement must indeed qualify as material favorable to the defense. This is so even though government counsel may not have believed Jackson at the time and the question went to his credibility. *See Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). And in *Jones v. Jago,* 575 F.2d 1164 (6th Cir. 1978), we upheld a determination by the trial judge that the express refusal to implicate the petitioner by a witness whose certain knowledge had to include whether there was such an involvement was exonerating within the meaning of *Brady.* The government's position that *Brady* does not require it to turn over to the defense that material which merely raises a conflict in the evidence, such as inconsistent statements by a co-conspirator, but only requires revelation of material which is directly exonerating, is in our judgment without merit. Moreover, the fact that Jackson had repudiated his earlier statement that he had paid Enright for his services would appear to be directly exonerating in all events.

■ Most instances of *Brady* violations occasion reversal because the withholding of the evidence is not discovered until after the conclusion of the trial. Here, however, the information was uncovered during the government's case-in-chief. While it is true that Enright had made only a general demand for exculpatory material, seeking "any and all evidence favorable to this defendant," we need not determine whether under *Agurs v. United States,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the evidence in the government's hand was "obviously exculpatory." *Id.* at 107, 96 S.Ct. 2392. *See Wagster v. Overberg,* 560 F.2d 735, 739 (6th Cir. 1977). Here the failure was discovered in time for full and adequate correction. When the matter was first set forth before the trial judge, the latter apprised Enright's counsel that he could have full opportunity to interview Jackson and that Jackson would be made available for summons as a witness if defense counsel so desired. Although critical of the government's conduct, the trial judge ruled that Enright had not been disadvantaged since it would not have made a dif-

ference if the defense had been told about the statement when Jackson made it, approximately two weeks before the trial began. We agree.[9]

We find no merit in the remaining issues. The parties agree that the appellant's claim of a denial of a speedy trial is to be measured against the four-part test articulated in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). So viewed, any delay was not fatal to the government's right to prosecute Enright. Delays which did take place were carefully examined by the trial judge. In the main, they were not excessive and relate not to any misconduct of the government but rather to the complexities of the lawsuit itself, a, crowded court docket, and the extensive pretrial activity in the case. These are neutral reasons to which we show more tolerance and attach minimal weight. *United States v. Mulligan*, 520 F.2d 1327 (6th Cir. 1975), *cert. denied*, 424 U.S. 919, 96 S.Ct. 1123, 47 L.Ed.2d 325 (1976). Enright's assertion that he first sought a prompt trial in March, 1975 does not find support in the record. The first record evidence of his insistence upon a speedy trial is in a motion to dismiss docketed in September, 1976. He was thereafter brought to trial on November 9, 1976, which is probably about as reasonable an accommodation as the court could make under the circumstances. Even assuming he had earlier demanded trial, as represented, the total lapse of time is 23 months, a period which is not fatal when measured against the four factors in *Barker v. Wingo* as applied here and in the absence of any demonstrated prejudice to his ability to defend himself.

Affirmed.

---

9. While the *Brady* issue was directly raised at trial and we have discussed it here, the issue appears more to have been framed on appeal on the basis that the tape-recorded hearsay testimony of Jackson, as introduced at trial, was unreliable in view of Jackson's later retraction and that the government should have been obligated to put Jackson himself on the stand. While such questions and arguments might properly be placed to the jury as bearing upon the weight that should be given to the evidence, it is well-settled that the out-of-court declarations of a co-conspirator may be introduced as evidence against the defendant without first showing that the co-conspirator is unavailable to testify at the trial. *See Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970); *United States v. Perna*, 491 F.2d 253, 255 (6th Cir.), *cert. denied,* 417 U.S. 934, 94 S.Ct. 2646, 41 L.Ed.2d 237 (1974); *United States v. McManus*, 560 F.2d 747, 750 (6th Cir. 1977), *cert. denied,* —— U.S. ——, 98 S.Ct. 894, 54 L.Ed.2d 798 (1978). While appellant points to language in *Stewart v. Cowan*, 528 F.2d 79 (6th Cir. 1976), which suggests that the government must show unavailability before introducing a co-conspirator's out-of-court statement, *see id.* at 84 & n. 3, the opinion also recognizes the controlling authority of *Dutton v. Evans* on this issue:

> In *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), the Court held that the out-of-court declaration of a co-conspirator could be introduced against the defendant without first showing that the co-conspirator was unavailable to testify at trial.
> *Id.* at 87.

We recognize that evidence properly admitted under the co-conspirator exception to the hearsay rule is also in most instances admissible under the Confrontation Clause. *See McManus, supra,* 560 F.2d at 750. Of course, no confrontation problem was present here because the trial judge expressly made confrontation available to the defense. That it chose not to avail itself of the invitation may have been proper strategy but cannot operate to work a constitutional deprivation.