780 F.2d 1023
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
(The decision of the Court is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter.)
UNITED STATES OF AMERICA, Plaintiff-Appellee
v.
AZAD TROY LUCASSIAN, Defendant-Appellant.
 84-1081
 United States Court of Appeals, Sixth Circuit.
 11/20/85
 
 AFFIRMED
 E.D.Mich.
 ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN
 Before: MARTIN and WELLFORD, Circuit Judges; and PECK, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Azad Lucassian appeals his jury conviction on three counts for passing and possessing counterfeit currency in Troy, Michigan in violation of 18 U.S.C. Sec. 472.
 
 
 2
 On three dates during May and June, 1982, Lucassian entered businesses located in Troy and paid for his purchases with $100 counterfeit bills. On May 14, 1982, Lucassian entered the Pooltown Distributor store and bought about $25 worth of chlorine. On May 18, 1982, he entered the Storm Seal Store and purchased a plastic window and some other items totalling about $25. Because Edward Barrington, the store proprietor, had never received a $100 bill in thirty years of business, he wrote down the license number of Lucassian's car. On June 15, 1982, Lucassian went to the Mike Dorian Ford Company to pay for repairs to his Cadillac and handed the cashier fifteen counterfeit $100 bills as partial payment for the repairs.
 
 
 3
 On May 19, 1982, the Secret Service received a referral from the Wayne-Oakland Bank concerning the passing of two counterfeit $100 bills at Pooltown and Storm Seal. The initial investigation established that Lucassian was the probable passer of the counterfeit bills.
 
 
 4
 Lucassian's downfall as a passer occurred when he returned to Pooltown on June 18, 1982 to purchase additional pool supplies. The cashier recognized him and contacted the Troy Police Department. After he left the store Lucassian was arrested by a Troy City Police Officer on an outstanding state warrant which turned up as part of this investigation. After Lucassian's personal property and affects were inventoried at the police station, his wallet was inspected, and three more counterfeit $100 bills were found.
 
 
 5
 Proof as to receipt of the counterfeit bills was evidence of a conspiracy between Lucassian and his cousin, Hovak Ardakian. On May 19, 1982, in New York City, Lucassian and Ardakian, met with Houshang Panahinia. Panahinia had gone to New York from Washington, D.C. to purchase counterfeit currency. After some negotiation, Panahinia paid $700 in genuine currency to Ardakian for $2,000 in counterfeit $100 bills.
 
 
 6
 Panahinia, who became a government informer, was later arrested for his possession and passing of counterfeit currency. Pursuant to a plea agreement he agreed to cooperate and introduce an undercover agent to Mr. Ardakian. On October 18, 1982, the agent met Ardakian in New York City. During the course of their meeting, Ardakian said that he had two sources of counterfeit currency, one in Armenia and another in Detroit. While the agent was present, Ardakian placed a ten-digit telephone call and asked to speak to Lucassian, but Lucassian was unavailable so a message was left for him to return the call. Ardakian then told the agent when the call was returned he would try to get one or two samples from him.
 
 
 7
 On October 19, 1982, the agent returned to Ardakian's business and another call was placed to Lucassian, but again he was unavailable. Proof of these calls was made with the telephone toll records of October, 1982, establishing that on both of these days a one minute call had been placed to Detroit, Michigan.
 
 
 8
 At trial Lucassian contended that while the $100 bills may have been counterfeit, he was not aware of it at the time he spent them. To counter this defense, the statements made by Ardakian on October 18 to the undercover agent were admitted as proof of the conspiracy and its continuation. These statements, of course, identified Lucassian as the source of the bills. He argues that there was not sufficient evidence of a conspiracy between Ardakian and himself, and that Ardakian's statements could not be admitted because they were not made 'in furtherance of a conspiracy.' We disagree.
 
 
 9
 Factual issues of conspiracy are reviewed under a clearly erroneous standard. United States v. Nichols, 695 F.2d 86, 91 (5th Cir. 1982). Expert testimony was received that the counterfeit notes seized from Lucassian and Panahinia were made by the same source or manufacturer, based upon common defects and characteristics. Add tionally, Ardakian's October 18 statement was proof of the existence of a conspriacy. See United States v. Vinson, 606 F.2d 149 (6th Cir. 1979), cert. denied, 444 U.S. 1074 (1980); and United States v. Enright, 579 F.2d 980 (6th Cir. 1978). In Enright, supra, we held that a co-conspirator's out-of-court statements were admissible under Fed. R. Evid. 801(d)(2)(E), if the trial judge finds by a preponderance of the evidence that a conspiracy existed, that the defendant was a member of the conspiracy, and that the statements were made in furtherance of the conspiracy. Id. at 986. In Vinson, supra, we decided that the co-conspirator's out-of-court statements may be considered by the trial court in making the Enright determination. The trial court in the instant case made a determination in accordance with Enright, supra, and found by a preponderance that a conspiracy existed and that the out-of-court statements were admissible.
 
 
 10
 Defendant relies on United States v. Gullet, 713 F.2d 1203 (6th Cir. 1983), cert. denied, 464 U.S. 1069 (1984), to support his argument that his June, 1982 arrest terminated the conspiracy, and consequently, the statements made by his cousin before the government agent could not have been made 'in furtherance of a conspiracy,' within the meaning of Fed. R. Evid. 801(d)(2)(E). Thus, defendant claims the October statement was excludable hearsay. We are not persuaded by defendant's argument, because Gullet, supra, is factually distinct from the present case.
 
 
 11
 In Gullet, supra, the proffered, co-conspirator's out-of-court statements established that the conspiracy had terminated and that the conspirators were engaged in nothing more than concealment of their conspiracy. While the arrest of one of the conspirators occurred shortly before the out-of-court statements were made and probably prompted them, our decision that the conspiracy had terminated was not based on the occurrence of the arrest, but on the substance of the statements. In the present case, we attach no greater importance to defendant's arrest. Instead we focus on the out-of-court statement made by defendant's cousin in October, 1982. That statement indicates, if anything, that the conspiracy was still in effect then. Hence, the statement was made 'in furtherance of the conspiracy' and was properly admissible. Other cases have recognized that, where there is evidence that the overall conspiracy is still active, post arrest statements may nevertheless be during and in furtherance of the conspiracy and admissible as such. See United States v. Harris, 542 F.2d 1283, 1301 (7th Cir.), cert. denied sub nom., 430 U.S. 934 (1977).
 
 
 12
 The judgment of conviction and the sentence of the district court is affirmed.