884 F.2d 1393
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Clifford R. WOGAMAN, Petitioner-Appellant,
v.
H. Gary WELLS, Respondent-Appellee.
 No. 88-1734.
 United States Court of Appeals, Sixth Circuit.
 Sept. 18, 1989.
 
 Before WELLFORD and RALPH B. GUY, Jr., Circuit Judges, and JOHN W. PECK, Senior Circuit Judge.
 PER CURIAM:
 
 
 1
 The petitioner, Wogaman, was originally charged with two counts of kidnapping and two counts of first degree criminal sexual conduct in the Genesee County, Michigan Circuit Court. Petitioner was tried jointly with six codefendants: David Wogaman, Richard Wogaman, Rodney Wogaman, Daniel Reinhart, Richard Danielson, and James Keene. After the jury selection the trial court recessed for some ten days before commencing the trial July 13, 1982.
 
 
 2
 Fifteen year old James Moore testified that on September 12, 1981, he and Jeffrey Gifford saw codefendant Rick Danielson as he drove by. Moore knew Danielson and his wife, Marcia, and frequently visited their apartment. By Moore's own admission, he had stolen two guns out of the Danielson's apartment about a week before. Upon sighting Danielson, Moore and his companion, Gifford, ran into a junkyard to hide. Moore and Gifford were found and then beaten in the junkyard. Both were put into the petitioner's car, and taken to Danielson's apartment.
 
 
 3
 Once inside the apartment, codefendant Reinhart ordered Moore and Gifford to engage in sexual acts with one another. They were watched by Reinhart, the Danielsons, James Keene, and by the four Wogamans, including petitioner. Marcia and Richard Danielson held guns on the victims during this episode. After approximately three or four hours during which the victims were forced to attempt acts of sodomy, they were taken to a bedroom. A few hours later, James Keene took Moore to a bathroom where he forced Moore into a sexual act as "payment" for a $100 debt.
 
 
 4
 Mark Wright, not charged as a codefendant, described seeing the two victims and their pursuit into the junkyard. He testified that the victims were "smacked around" by the petitioner, his brother Richard, and Richard Danielson. After the victims were taken back to the apartment there was evidence that petitioner, Richard Wogaman, and Richard Danielson again beat Moore. Wright further testified that Richard Danielson wielded a shotgun inside the apartment.
 
 
 5
 Codefendant Marcia Danielson testified after entering a guilty plea pursuant to a plea arrangement. She identified the petitioner as one of the men who brought Moore and Gifford into her apartment on the day in question. Marcia Danielson admitted that she "intimidated" the victims by holding a shotgun. She testified that Richard Wogaman suggested that they force Moore and Gifford into sexual acts in the presence of Clifford.
 
 
 6
 Marcia Danielson described in detail the forced sexual activity that took place. She noted that the victims objected and resisted. Marcia believed the petitioner was present during this activity. The police arrived at the apartment the next morning. She answered the door and asked them if they had a warrant. They said no, but that they were looking for James Moore whose life might be in danger. She then allowed the police into the apartment.
 
 
 7
 Gifford's testimony was consistent with that given by Moore regarding the kidnapping from the junkyard and the sexual acts. Following Gifford's testimony, defense counsel moved for and was granted a hearing outside the presence of the jury of the type permitted in People v. Walker, 374 Mich. 331 (1965). Robert Joseph Pickell testified in this hearing that defense counsel had requested that he interview the petitioner and conduct a polygraph test. He informed the petitioner of his Miranda rights. The petitioner acknowledged that he understood these rights and signed the waiver form, but no polygraph was conducted.
 
 
 8
 The petitioner took the stand at the Walker hearing. He testified to his agreement with the defense counsel that he would discuss only the incident involving the criminal sexual conduct charges and would not answer questions regarding the kidnapping charges. He admitted knowing that Pickell had not consented to confine his questions at the polygraph test only to the sexual conduct charges. The petitioner testified that after Pickell read him his rights, Pickell stated that it was all right to discuss the kidnapping charges and kept "nagging" the petitioner to do so. Clifford told Pickell that he had no sleep the night before his encounter with him. Under cross-examination, the petitioner admitted that he was in control of himself during the questioning.
 
 
 9
 Defense counsel argued that the petitioner had not waived his right to have counsel present at the polygraph test and that the petitioner was deceived, tricked, and cajoled in being deliberately subjected to an interrogation rather than a mere polygraph test. Pickell testified that he did not complete the polygraph test because after the petitioner made certain admissions he became "emotionally upset" and was therefore not a proper subject for testing. Defense counsel agreed that another operator, Mr. Harris, could then perform the test. Pickell testified to following police procedures in advising petitioner of his constitutional rights for the purpose of conducting polygraph tests. The prosecutor, in any event, withdrew the petitioner's statement to Pickell for purposes of substantive evidence in the case in chief.
 
 
 10
 After the prosecutor rested his case, the trial court took a recess of another week because of a scheduled vacation period. The prosecutor, not the defendants, objected to the adjournment.
 
 
 11
 The petitioner testified at trial that he was in the car driven by Richard Danielson, with Wright and Richard Wogaman, when they spotted James Moore. Danielson drove around to the junkyard. Petitioner admitted that he, Richard Wogaman, and Danielson began searching for Moore, but after locating them, he denied that Moore and Gifford were forced into the car. He admitted hitting Moore only once when they were inside Danielson's apartment. The petitioner further testified that he stayed in the apartment for only a short time before leaving, and he claimed he did not return. Following the petitioner's testimony, the trial court permitted the prosecutor to impeach the petitioner on cross-examination with his prior inconsistent statements given during the abortive polygraph test.
 
 
 12
 Defense counsel indicated no dissatisfaction with the instructions given to the jury.[1] During its deliberations the jury requested and was given a definition of "kidnapping," and within two hours a verdict was returned finding petitioner guilty on the two counts of kidnapping and not guilty on the two counts of first degree criminal sexual conduct.
 
 
 13
 Petitioner was then sentenced to two concurrent lengthy terms of imprisonment. He appealed as of right to the Michigan Court of Appeals, which remanded for further explanation of Clifford Wogaman's sentence. Thereafter, the Court of Appeals affirmed the petitioner's convictions and sentences in an unpublished per curiam opinion on May 2, 1984.
 
 
 14
 The petitioner then filed a letter request in the Michigan Supreme Court for the right to appeal. Counsel was appointed to represent the petitioner who filed a delayed application for leave to appeal. The Michigan Supreme Court denied petitioner's delayed application stating "we are not persuaded that the questions presented should be reviewed by this Court."
 
 
 15
 In his petition for writ of habeas corpus in the federal district court, Wogaman made four claims of alleged constitutional violations: (1) denial of a fair trial because the trial court denied his motion for severance; (2) denial of a speedy trial, (3) violation of his Fifth Amendment right against self-incrimination because he was impeached with a prior inconsistent statement; and (4) the trial court's failure to instruct the jury on the meaning of asportation. He also challenged the court's handling of numerous optional verdicts. The petitioner now appeals the denial of his habeas corpus application.
 
 1. Severance Denial
 
 16
 The Michigan court of appeals described Michigan's policy on a motion by codefendant for a separate trial:
 
 
 17
 Criminal defendants do not enjoy an absolute right to separate trials, and there exists a strong policy favoring joint trials in the interest of justice, judicial economy and administration. People v. Meyers (On Remand), 124 Mich.App. 148, 156; 335 NW2d 189 (1983); People v. Carroll, 396 Mich. 408; 240 NW2d 722 (1976).
 
 
 18
 * * *
 
 
 19
 * * *
 
 
 20
 When moving for severance, the defendant must clearly, affirmatively, and fully show that his substantial rights would be prejudiced by joint trial. A conclusory statement of antagonistic defenses must be supported by an affidavit defining the inconsistencies between the defenses. People v. Gibbs, 120 Mich.App. 485, 489; 328 NW2d 65 (1982); People v. American Medical Centers, 118 Mich App. 135, 145; 324 NW2d 782 (1982), lv den 417 Mich. 985 (1983); People v. Kramer, 108 Mich.App. 240, 256; 310 NW2d 347 (1981).
 
 
 21
 The Michigan court, after reviewing the record, held that "there was no showing that the defenses of the defendants were antagonistic, nor did it appear that one defendant would testify to exculpate himself and incriminate another." It concluded that there was no abuse of discretion in denying the severance bond on these findings.
 
 
 22
 The petitioner claims prejudice attributable to the prior criminal convictions of codefendants Keene, Richard Wogaman, and Danielson which were brought to the jury's attention for impeachment purposes. Keene, a six foot, seven inch, 280 pound ex-convict and former member of a notorious motorcycle club, was accused not only of kidnapping but also of taking one young victim into a bathroom and forcing him to work off a $100 debt by submitting to a perverted sexual act. Petitioner argues that by placing him on trial with a codefendant like Keene whose style of living would offend some members of the jury, he would be prejudiced. The petitioner also notes that on at least twenty-five occasions, the jury heard the name "Wogaman" with no sure specification as to which of the four brothers, including the petitioner, the witness was discussing.
 
 
 23
 The petitioner also argues that this case presented a problem in the use of Reinhart's statement that "all of us" were forcing the victims into sexual acts. See Bruton v. United States, 391 U.S. 123 (1968). Finally, the petitioner claims, in connection with severance, that presenting the jury with numerous possible verdicts made the jury's job unnecessarily complex.
 
 
 24
 The petitioner must demonstrate to obtain relief that the refusal to sever rendered his state trial fundamentally unfair. Demps v. Wainwright, 666 F.2d 224, 227 (5th Cir.1982), cert. denied, 459 U.S. 844 (1982). We must determine from the entire record whether the fundamental right to a fair trial as secured by the Fourteenth Amendment was abridged by denial of the requested severance. Jenkins v. Bordenkircher, 611 F.2d 162, 168 (6th Cir.1979).
 
 
 25
 The district court fully addressed the issue including the points raised by the petitioner. We find no error in its conclusion that no constitutional right was violated in the exercise of discretion to deny a severance. We also give great deference to the Michigan courts' findings in this regard.
 
 2. Speedy Trial
 
 26
 The petitioner's second claim is that he was denied his right to a speedy trial because the criminal episode occurred on September 13, 1981, and the jury did not render its verdict against him until July 30, 1982. Two mid-trial delays allegedly exacerbated the constitutional wrong. The judge unfortunately took two vacations in the middle of trial. The Michigan appellate court criticized this procedure but found it not to constitute error. The Supreme Court has held that the Sixth Amendment right to a speedy trial cannot be defined in terms of a fixed period of days or months but must be analyzed on a case-by-case basis. The Court identified the following four factors to be considered in determining whether a petitioner has been deprived of his right to a speedy trial: (1) the length of the delay, (2) the reason for the delay, (3) the petitioner's assertion of his right, and (4) the prejudice to the petitioner. Barker v. Wingo, 407 U.S. 514 (1972). See also United States v. Macdonald, 456 U.S. 1 (1982). The length of the delay is, to some extent, the major factor. Consideration of the other factors is necessary only when the delay is presumptively prejudicial under the circumstances of the case. The pretrial delay in this case was approximately ten months. Significantly longer delays have been held not to violate the Constitution. See, e.g., United States v. Enright, 579 F.2d 980 (6th Cir.1978) (23 months); United States v. Mulligan, 520 F.2d 1327 (6th Cir.), cert. denied, 424 U.S 919 (1975) (25 months).
 
 
 27
 The record indicates further that at least part of the delay was attributable to the petitioner, who together with other defendants filed seven motions for severance and two motions to quash. The Michigan Court of Appeals properly noted that the prosecutor was entitled to a reasonable time to answer the motions and the trial court was entitled a reasonable amount of time to consider and rule upon these motions. See People v. Cutler, 86 Mich.App. 118, 247 NW2d 206 (1978).
 
 
 28
 Considering that the trial involved seven defendants and numerous pretrial motions, we find no error in the conclusion that a ten-month pretrial delay was not unreasonable. The petitioner has failed to demonstrate or even to allege that he was prejudiced by any of the delays. Prejudice to the accused is a critical and essential consideration. Grigg v. State of Tennessee, 507 F.2d 949 (6th Cir.), cert. denied, 420 U.S. 938 (1974); Cain v. Smith, 686 F.2d 374 (6th Cir.1982). This claim we find to be without merit.
 
 3. Use of Statement for Impeachment
 
 29
 Petitioner's third claim is denial of a fifth amendment right against self-incrimination in the use of a polygraph "related" statement. The prosecutor asked the petitioner whether he had made certain statements to the polygraph operator, Pickell. The petitioner denied that he had made any such statements. The statements given, as testified by Pickell, were all inconsistent with live trial testimony given by the petitioner.
 
 
 30
 The district court determined that petitioner's statement was voluntarily made after receipt of Miranda v. Arizona, 384 US. 436 (1966), advice of rights.
 
 
 31
 Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury.... Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process. Had inconsistent statements been made by the accused to some third person, it could hardly be contended that the conflict could not be laid before the jury by way of cross-examination and impeachment (citations omitted).
 
 
 32
 Harris v. New York, 401 U.S. 222 (1972).
 
 
 33
 The Michigan appellate court, citing Miranda, concluded that "[T]he statement was not obtained in violation of his rights ... and was voluntarily made ... [and] was properly admissible for impeachment purposes." Petitioner contends that the polygraph operator "tricked" him into making the statement by promising a polygraph test, but the record does not demonstrate that the petitioner was deceived or duped.
 
 
 34
 The prosecutor withdrew his request to introduce the petitioner's statement as substantive evidence following a lengthy Walker hearing. It was not until the petitioner had testified on direct and contradicted this prior statement that the prosecutor was permitted to impeach the petitioner with his prior inconsistent statement.
 
 
 35
 We find no basis for error in the district court's denial of this ground for relief.
 
 4. Instruction on Asportation
 
 36
 Again we quote the finding and conclusion of the Michigan appellate court:
 
 
 37
 A claim of reversible error cannot be grounded on the failure to give an instruction which was not requested by the accused. People v. Jones, 395 Mich. 379, 393; 236 NW2d 461 (1975); People v. Carroll, 396 Mich. 408, 415; 240 NW2d 722 (1976). In the instant case, the defense attorney for Clifford Wogaman stated that he was satisfied with the court's instructions to the jury. Defense counsel made no request for further instructions. In addition, the court instructed the jury as to each defendant's theory of his defense. The jury was well informed regarding the issue of consent and the alternative of finding the defendants not guilty. Therefore no manifest injustice occurred as a result of the court's instructions.
 
 
 38
 The petitioner's final claim is that the trial court failed to instruct the jury properly as to what did and what did not constitute asportation in a kidnapping case. The petitioner claims that the trial court's failure to give an adequate charge to the jury regarding asportation violated his Sixth Amendment rights. The State of Michigan requires a contemporaneous objection for all alleged erroneous jury instruction claims in order to preserve the issue for appellate review. People v. Acola, 396 Mich. 99 (1976).
 
 
 39
 In addition to the petitioner's failure to object, instructional errors to the jury generally do not involve the deprivation of federal constitutional rights. Gemmel v. Buckhoe, 358 F.2d 338 (6th Cir.), cert. denied, 385 U.S. 962 (1966). Only in circumstances implicating fundamental fairness or specific constitutional violations is a federal question presented. We consider on this appeal only federal constitutional questions. Henderson v. Kibbe, 431 U.S. 145 (1977).
 
 
 40
 Judicial review of the significance of an alleged instructional error requires comparison of the instructions actually given with those that should have been given. Henderson at 154:
 
 
 41
 It is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court.... The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal. The question in such a collateral proceeding is "whether the ailing instruction by itself so infects the entire trial that the resulting conviction violates due process", ... not merely whether "the instruction is undesirable, erroneous, or even 'universally condemned,' " ... (citations omitted).
 
 
 42
 Id. at 154. The claim here is prejudice resulting from failure to give an unrequested instruction. The district court held that such an omission is less likely to be prejudicial than a misstatement of law. The trial court's challenged kidnapping instruction stated, in pertinent part:
 
 
 43
 These are the elements that the prosecution must establish in order to establish a kidnapping beyond a reasonable doubt: First, that the victim or victims must have been forcibly confined or imprisoned; second, that the victim must have been so confined or imprisoned against his will and without lawful authority; next, that during the course of such confinement the defendant must have forcibly moved the victim or caused him to be removed from one place to another for the purpose of kidnapping or abduction.... If the evidence convinces you beyond a reasonable doubt that there was a movement and it was for the purpose of abduction of the victim, then that's a sufficient showing for the establishment of that element of the alleged crime. (emphasis added)
 
 
 44
 This court's instruction regarding the features of asportation required for a finding of kidnapping is consistent with the rule established by the Michigan Supreme Court in People v. Barker, 411 Mich. 291 (1981), in which the court stated:
 
 
 45
 When it is necessary to find asportation in order to find guilt of kidnapping, it must be shown to be movement having significant independence of any accompanying offense. A course of movement incidental of both a kidnapping and other offense could be of such quality and character as to supply the asportation element of kidnapping. (emphasis added)
 
 
 46
 411 Mich. at 300. The petitioner has not shown that the movement or asportation element had independent constitutional significance under the circumstances. We, again, find no error in the claim.
 
 
 47
 Accordingly, we AFFIRM the decision of the district court in all respects.
 
 
 
 [1]
 There was a nearly two hour lunch "recess" during the giving of instructions