19 F.3d 1434
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Joseph I. HARRIS (4149) and Clarence L. Harris (4150),
Defendants-Appellants.
 Nos. 92-4149, 92-4150.
 United States Court of Appeals, Sixth Circuit.
 March 22, 1994.
 
 On Appeal from the United States District Court for the Northern District of Ohio, No. 92-00196; David D. Dowd, Jr., District Judge.
 N.D.Ohio
 AFFIRMED.
 Before: KENNEDY, SILER and BATCHELDER, Circuit Judges.
 PER CURIAM.
 
 
 1
 On July 7, 1992, a federal grand jury, sitting in Cleveland, Ohio, handed down a fourteen count indictment on drug-trafficking and related offenses, naming appellants Clarence and Joseph Harris, along with co-defendants Anthony S. Revels and Shaun Williamson. Joseph and Clarence Harris proceeded to trial on the counts in which they were named,[1] while Revels and Williamson entered pleas of guilty.
 
 
 2
 Joseph Harris was found guilty on each of the charges against him and now appeals his convictions for conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. Sec. 846; knowingly and intentionally attempting to possess with intent to distribute cocaine, in violation of 21 U.S.C. Sec. 841(a)(1), 841(b)(1)(B), and 846, and 18 U.S.C. Sec. 2; and utilization of a communication device, to wit: a telephone, in violation of 21 U.S.C. Sec. 843(b), to facilitate acts constituting a felony under 21 U.S.C. Sec. 841(a)(1) and 846. Clarence Harris was acquitted of the charge of knowingly and intentionally attempting to possess with intent to distribute cocaine, in violation of 21 U.S.C. Sec. 841(a)(1), 841(b)(1)(B), and 846, and 18 U.S.C. Sec. 2, and appeals his conviction on the charge of conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. Sec. 846. For the reasons that follow, we affirm the convictions of both defendants.
 
 I.
 
 3
 On April 1, 1992, a court-ordered wire tap commenced on the telephone at the residence of Anthony S. Revels, located in Cleveland, Ohio. Between April 28, 1992 and April 30, 1992, a number of phone calls from defendants Anthony Revels and Shaun Williamson to Joseph and Clarence Harris were intercepted.
 
 
 4
 On April 28, 1992, a call from Revels and Williamson to Joseph Harris at Harris' home number was intercepted. The purpose of this call was to negotiate a price and arrange a three-kilo purchase of cocaine by Joseph and Clarence Harris from Williamson and Revels. A price of $23,000 per kilogram was agreed upon. Joseph Harris indicated he would travel to Cleveland the following day to consummate the deal.
 
 
 5
 On April 29, 1992, at 7:01 p.m., a call from Shaun Williamson to the residence of Joseph Harris was intercepted. An unidentified female answered the phone. During the short conversation, Williamson identified himself as "Shaun," inquired if "Joe" was home and was told by the female that he was not. Again on April 29, 1992, at 7:48 p.m., a phone conversation was intercepted between Revels and Williamson on one end and Joseph and Clarence Harris on the other. In substance, this conversation was an attempt by the Harrises to persuade Williamson to bring the cocaine to Cincinnati. Williamson indicated he would not do so because he had previously lost money on such a deal. Clarence Harris responded by inquiring how long they would have to wait in Cleveland before receiving the cocaine and Williamson assured him that they would not have to wait long at all. Finally, on April 29, 1992, at 8:04 p.m., Joseph Harris and Williamson made plans over the telephone for the Harrises to come to Cleveland to obtain the cocaine on the following day. Joseph Harris indicated to Williamson that he would contact Williamson when he arrived in Cleveland.
 
 
 6
 In the early morning hours of April 30, 1992, Williamson called the Harris brothers at a Motel 6 in Middleburg Hts., Ohio. Joseph Harris indicated that he and his brother had just gotten in and that Williamson should telephone them later in the morning to complete the deal. The motel registry at the Motel 6 in Middleburg Hts., indicated that in the early morning hours of April 30, 1992, room # 149 was registered to Clarence Harris who had listed an Astro Van, license number FAQ-349, as his vehicle. This van was observed outside of room # 149 by officers from the Caribbean/Gang Task Force doing surveillance of the motel, and was found to have false license plates.[2]
 
 
 7
 At approximately noon on April 30, 1992, various Task Force officers saw the Harrises leave the motel in the van, and Williamson leave Revels' residence in an automobile. The officers observed a meeting between the Harrises and Williamson, in their vehicles, at a McDonald's restaurant. After some conversation, the Harrises and Williamson left the McDonald's and for a time drove side by side down the street while Williamson and Clarence Harris carried on conversation through the open windows of their vehicles. The vehicles then headed off in different directions.
 
 
 8
 At this point, the officers dispatched a B.O.L.O. ("Be On The Lookout For") to the Ohio State Highway Patrol setting forth the fact that the van, believed to be headed south on I-71, had false plates and that the occupants were believed to be in possession of cocaine. The van was stopped by the State Highway Patrol[3] and after a thorough search, troopers recovered $44,890 bundled in rubber bands. No drugs, or any paraphernalia or drug kits were recovered from the van and, although the van was impounded, both of the Harrises were released.
 
 
 9
 Several weeks later, Joseph Harris was arrested and made an oral statement admitting his culpability in the offense. Specifically, Joseph Harris told Detective Hennekes that he received calls from an individual named Shaun about purchasing cocaine. Harris stated that Shaun had quoted prices of between $25,000 and $26,000 per kilo of cocaine for what originally was to have been a three kilo deal. Harris also told Hennekes that he put together $44,000, of which $10,000 was his own money, and that his brother, Clarence, had agreed to drive him to Cleveland because Joseph did not have a driver's license. Joseph said that he and Clarence travelled to Cleveland and checked into a motel.
 
 
 10
 Joseph also confessed that he contacted Shaun on his sky pager and arranged to meet him at McDonald's. According to Joseph, once they arrived at McDonald's they were met by a man who identified himself as Shaun, and another man, whom Joseph said he did not know. Joseph stated that when Shaun told them to follow him across town, the Harrises did not feel right about the arrangement and decided to get back on the highway to Cincinnati.
 
 II.
 A. The Vinson-Enright Finding
 
 11
 The Harrises first argue that the district court failed to make any finding that a conspiracy to possess cocaine with intent to distribute existed and that they were part of the conspiracy, and hence the admission against them of the statements of co-conspirators Revels and Williamson contained in the taped telephone conversations was error.
 
 
 12
 In United States v. Enright, 579 F.2d 980 (6th Cir.1978), this Court held that in order to utilize the Federal Rule of Evidence 801(d)(2)(E) co-conspirator exception to the hearsay rule the government must demonstrate by a preponderance of the evidence: (1) that a conspiracy existed, (2) that the defendant against whom the evidence is offered was a member of the conspiracy, and (3) that the hearsay statement was made in the course and furtherance of that conspiracy. Id. at 986. In United States v. Vinson, 606 F.2d 149 (6th Cir.1979), cert. denied, 444 U.S. 1074 (1980), we set out the three permissible methods by which district courts can make an Enright finding. The first method allows the judge to hold a "mini-hearing" in which the court, without a jury, hears the evidence and makes the preliminary Enright finding. Vinson, 606 F.2d at 152. The second method permits the judge to require the government to produce its non-hearsay evidence of conspiracy prior to the court's making the preliminary Enright finding. Id. Finally, a judge may permit the hearsay statements to come in subject to their being shown by a preponderance of the evidence to be admissible. Id. at 153. And the co-conspirators' statements may be considered in making the determination of whether a conspiracy existed. Bourjaily v. United States, 483 U.S. 171 (1987).
 
 
 13
 The Harrises assert that the district court never made the required Enright finding; therefore, they argue that the prosecution was improperly relieved of its burden to prove the existence of the conspiracy. We disagree.
 
 
 14
 First, we note that the Harrises never objected to the admission of the Rule 801(d)(2)(E) evidence at any point during the trial.[4] At the close of the government's case, neither defendant requested that the court make a finding as to the co-conspirator statements. Furthermore, neither defendant objected to the court's final charge to the jury on conspiracy. Therefore, we will review for plain error the trial court's failure to make an explicit finding on the record that a conspiracy existed.
 
 
 15
 The district court rejected the Harrises' Rule 29 motions for acquittal, and instructed the jury on conspiracy. Additionally, the Harrises themselves asked for and received an instruction on withdrawal from a conspiracy, which the court was entitled to view as a tacit acknowledgment that they did not contest the fact of a conspiracy. The facts and the record in this case make it clear that the district court implicitly found the existence of a conspiracy; therefore, we find that the district court's failure to make the explicit finding on the record was not plain error.
 
 B. Sufficiency of the Evidence
 
 16
 The Harrises next assign as error that the evidence was insufficient to support their convictions on the conspiracy count. An appellate court, when reviewing the sufficiency of the evidence to support a conviction, must view all of the evidence in the light most favorable to the government, giving full weight to all reasonable inferences to be drawn from the evidence. Jackson v. Virginia, 443 U.S. 307, 319 (1979); United States v. Gibson, 675 F.2d 825, 829 (6th Cir.), cert. denied, 459 U.S. 972 (1982). The reviewing court can only reverse if after viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. United States v. Ellzey, 874 F.2d 324, 328 (6th Cir.1989). This standard remains the same whether the evidence is direct or circumstantial. United States v. Gallo, 763 F.2d 1504, 1518 (6th Cir.1985), cert. denied, 475 U.S. 1017 (1986).
 
 
 17
 Joseph and Clarence Harris contend first that there was insufficient evidence to prove the existence of a conspiracy. The Harrises assert that, at best, all that this evidence proved is that negotiations took place, or that this was merely a buyer-seller relationship. The Harrises cite United States v. Iennaco, 893 F.2d 394 (D.C.Cir.1990), for the proposition that mere negotiations cannot support a conviction of conspiracy. In Iennaco, "[t]he government's evidence, ... showed only negotiations, solicitations and counter-offers, but no agreement between [the parties]." Id. at 397. The Harrises' situation, however, is easily distinguishable because the government had numerous tapes of phone conversations among the co-defendants that, as interpreted by Agent Riolo at trial, establish that the Harrises and their co-defendants had a firm agreement for the sale of a quantity of cocaine, and that they met for the purpose of conducting the transaction.
 
 
 18
 The Harrises next assert that there was insufficient evidence to prove anything beyond the existence of a buyer-seller relationship. This Circuit recognizes that, standing alone, a buyer-seller relationship cannot support a conspiracy conviction. See United States v. Phibbs, 999 F.2d 1053, 1064 (6th Cir.1993), cert. denied, 114 S.Ct. 1070 (1994) & 114 S.Ct. 1071 (1994); United States v. Cooper, 868 F.2d 1505, 1522 (6th Cir.), cert. denied, 490 U.S. 1094 (1989); United States v. Meyers, 646 F.2d 1142, 1145 (6th Cir.1981). However, "where there is additional evidence beyond the mere purchase or sale, from which knowledge of the conspiracy may be inferred, courts have upheld conspiracy convictions." United States v. Grunsfeld, 558 F.2d 1231, 1235 (6th Cir.), cert. denied, 434 U.S. 872 (1977) & 434 U.S. 1016 (1978). There was sufficient evidence in this case for a reasonable trier of fact to infer that this was more than a mere buyer-seller relationship. The defendants negotiated and arrived at a price for at least two kilos of cocaine, the Harrises traveled from Cincinnati to Cleveland, they met with Shaun Williamson, and the amount of cocaine involved was far greater than possibly could have been used for personal consumption. Appellants' claim that the evidence was insufficient to support their convictions on the conspiracy charge is without merit.
 
 C. The Withdrawal Instruction
 
 19
 In their final assignment of error, the Harrises contend that the district court committed plain error when it instructed the jury on withdrawal from a conspiracy. In essence, the Harrises argue that had the district court attempted to make an explicit Enright finding, it would have recognized that the evidence was insufficient to support a finding that there was any agreement among the defendants to possess with intent to distribute cocaine, and the giving of the withdrawal instruction was improper because it implied to the jury that a conspiracy, based on such an agreement, existed from which the defendants could have withdrawn.
 
 
 20
 We have held, however, that the district court implicitly found that a conspiracy existed. It was the Harrises who, without making any objection to the admission of the co-conspirators' statements or to the lack of an explicit Enright finding, requested that the withdrawal instruction be given. And the instruction did not misstate the law regarding withdrawal. Therefore, we hold that the district court did not commit plain error in giving the withdrawal instruction.
 
 III.
 
 21
 Accordingly, the convictions of both appellants are hereby AFFIRMED.
 
 
 
 [1]
 Joseph Harris went to trial on counts 7, 8, 10, 11 and 12, while Clarence Harris was tried only on counts 7 and 8
 
 
 [2]
 The officers also determined that the van matched the description of a van which agents of the FBI in Cincinnati had seen parked outside of Joseph Harris's residence on April 29, 1992
 
 
 [3]
 The trooper testified that after spotting the van he checked the license plate (the van had only a rear plate) and verified that it was registered to a vehicle other than the van. The trooper explained to the Harrises that he was stopping the van because of the missing license plate, because the plate on the van had not been issued to the van, and because there was a bulletin out alerting law enforcement that the occupants of the van were suspected of having cocaine in their possession
 
 
 [4]
 Clarence Harris' counsel filed a motion on the morning of trial requesting that the court order the government to lay a foundation for the hearsay statements prior to their being introduced in evidence. The judge, as permitted by Vinson, denied this motion. At no point during the trial was an objection to the admission of these statements raised