RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 26a0108p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee*,

*v.*

JOSEPH MICHAEL MCNORIELL,

        *Defendant-Appellant*.

No. 24-2067

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:23-cr-00064-1—Jane M. Beckering, District Judge.

Argued:  February 4, 2026

Decided and Filed:  April 6, 2026

Before:  BATCHELDER, CLAY, and RITZ, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Eric Eckes, PINALES, STACHLER, YOUNG & BURRELL, CO., L.P.A., Cincinnati, Ohio, for Appellant.  Vito S. Solitro, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.  **ON BRIEF:** Eric Eckes, PINALES, STACHLER, YOUNG & BURRELL, CO., L.P.A., Cincinnati, Ohio, for Appellant.  Vito S. Solitro, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

---

**OPINION**

---

RITZ, Circuit Judge.  A jury convicted Joseph McNoriell of drug crimes.  McNoriell now appeals, on several grounds, his conviction and 110-month sentence.  For the following reasons, we affirm.

I.

A.

After Drug Enforcement Administration (DEA) agents recruited drug trafficker Michael Allen as a confidential source, they learned that Allen got his heroin and cocaine from McNoriell.  So, DEA agents enlisted Allen to purchase two kilograms of cocaine in a "buy-bust" operation, where Allen would arrange, but not complete, the purchase, and agents would then arrest McNoriell.  The DEA agents directed Allen to meet with McNoriell on May 26, 2022, to discuss the deal.  Without the agents' knowledge or permission, and in violation of his cooperation agreement with the government, Allen purchased heroin from McNoriell later that day—an act Allen believed was necessary to avoid suspicion that he was working with law enforcement.

In the following days, Allen made three recorded phone calls, with agents present, to McNoriell to coordinate the cocaine purchase.  During one call, DEA Agent Eric Falletich directed Allen to arrange for the transaction to take place in Lansing, Michigan, where the agents' office was located.  In a later call to Allen, McNoriell explained he planned to use a hotel room in the Lansing area to "take care of the business" and reserved a room under his own name. RE 142, Trial Tr., Vol. I, PageID 971, 985-86.  This decision to rent a hotel room prompted the agents to switch from a buy-bust operation to a stop of McNoriell's vehicle, in order to protect Allen and the officers' safety.

On June 2, 2022, the day of the drug purchase, DEA agents saw a white Ford Escape pull up to McNoriell's car in a parking lot in Farmington Hills, Michigan.  James Bogan, a

co-conspirator, got out of the Escape and got into McNoriell's car. The two cars traveled to the Lansing area but were stopped by Michigan State Police. Officers searched the cars and found two kilograms of cocaine in the Ford Escape, which was being driven by Shantel Caldwell.

B.

A grand jury indicted McNoriell for conspiracy to distribute and possess with intent to distribute heroin and 500 grams or more of cocaine, from August 2021 to June 2022, in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(B)(ii), (b)(1)(C) (Count I); and possession with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B)(ii) and 18 U.S.C. § 2 (Count II). The district court appointed him an attorney. As the case proceeded, McNoriell went through three different attorneys. McNoriell ultimately moved to represent himself on January 8, 2024, roughly four months before trial. Nearly two weeks later, a magistrate judge advised McNoriell of his right to represent himself and the risks of doing so as required by *Faretta v. California*, 422 U.S. 806 (1975). McNoriell acknowledged these risks and still elected to represent himself. The magistrate judge found that McNoriell knowingly and voluntarily waived his right to counsel and appointed McNoriell's former attorney, Scott Graham, as standby counsel.

Approximately two weeks before trial, the district court held its final pretrial conference, at which it conducted another *Faretta* colloquy. McNoriell again confirmed that he wanted to proceed pro se. Although Graham would act as McNoriell's standby counsel, the district court explained McNoriell was "in control" of his representation. RE 141, Pretrial Conference Hr'g Tr., PageID 765. The court also clarified that McNoriell could "ask [Graham] to advise [him]," "choose to ignore" Graham's advice, and decide "[h]ow much or little [he] want[ed] to use [Graham's assistance]." *Id.* McNoriell confirmed that he and Graham had "been working together." *Id.*

The district court then described how *voir dire* would proceed. The court explained if McNoriell wanted to challenge a juror, he should tell Graham, who would then inform the court at sidebar conference. Ultimately, however, the court told McNoriell: "It's your decision. This is your jury. You need to feel good about them." *Id.* at PageID 772. The court asked McNoriell

if he had "[a]ny concerns about [*voir dire* representation]," and he replied, "Not at all."  *Id.* at PageID 773.  When asked if the process "[s]ound[ed] acceptable," McNoriell replied, "Yep."  *Id.*

Finally, because of "the nature of the pro se representation" that would prevent McNoriell from approaching the lectern, the court determined that each side would conduct questioning from counsel's table throughout the trial, so that both parties would "be treated equally."  *Id.* at PageID 780-81.

## C.

Before summoning prospective jurors on the first day of trial, the district court asked McNoriell what Graham's involvement in the trial would be.  McNoriell replied that he and Graham would decide who would cross-examine each witness "at [the] time" the witness testified, and they would "play it by ear" as to the opening statement.  RE 142, Trial Tr., Vol. I, PageID 800.  The district court reiterated that McNoriell was "in control" and that the court would "let [him] make decisions in terms of how [he] want[ed] that to proceed."  *Id.*

During *voir dire*, the district court held eight sidebar conferences with Graham acting on behalf of McNoriell (as agreed upon in the pretrial conference), seven of which involved for-cause challenges.  In four of those challenges, both sides agreed to strike jurors.  In one conference, the defense attempted to use a second peremptory strike on an alternate juror when the district court only permitted one strike on alternates.  And in two of those challenges, the defense lost contested for-cause challenges but nonetheless used peremptory strikes on those jurors.  In the remaining sidebar, a prospective juror discussed her experience as a victim of sexual assault.

## D.

### 1.

McNoriell and Graham both actively represented the defense at trial.  Graham delivered the opening statement, cross-examined two of the government's witnesses (including Allen), argued a motion to exclude the admissibility of co-conspirator statements, and argued to overrule the government's objection to witness testimony at sidebar.  McNoriell cross-examined the

remaining five witnesses, gave closing argument, and represented the defense at the jury instruction conference.  McNoriell and Graham both raised objections during trial.

After *voir dire*, the district court only held one other sidebar conference.  During Graham's cross-examination of the Michigan state trooper who discovered the cocaine in Caldwell's car, the government objected to Graham's questioning about what the trooper believed was legally required to search the vehicle.  The court had previously granted the government's motion in limine to exclude evidence relating to the constitutionality of the stop.  At sidebar, the district court warned Graham that he was "stepping into some dangerous waters" and sustained the government's objection.  RE 143, Trial Tr., Vol. II, PageID 1199.

2.

During its case, the government called DEA Agent Falletich to testify about the investigation of McNoriell, as well as Allen's cooperation as an informant.  Through Falletich, the government admitted the three recorded calls between Allen and McNoriell arranging the June 2022 drug purchase.  Falletich, who was present for these calls, interpreted portions of them for the jury.  During one call, McNoriell asked Allen if he "need[ed] it to come [his] way," which Falletich interpreted to mean that McNoriell was surprised that Allen wanted the cocaine to come to Lansing.  RE 142, Trial Tr., Vol. I, PageID 969.  As to the meaning of "she don't get off work until, like . . . six," Falletich understood McNoriell to mean that a female courier would transport the cocaine to Lansing.  *Id.* at PageID 969-70.  And upon hearing McNoriell tell Allen he would get a "room out there where you're at, and [] you're going to go there and take care of the business," Falletich testified that the agents "switched from a buy-bust operation in Lansing . . . to a vehicle stop before Lansing" to protect Allen and the officers' safety.  *Id.* at PageID 971-72.

Allen also testified at trial.  The government again played the three recorded calls and asked Allen to provide his interpretations.  During cross-examination, Graham asked Allen about his unauthorized May 2022 purchase of heroin from McNoriell.  Allen testified that "every time I meet [McNoriell] is [for] a drug transaction . . . my life is in danger with this person, and every time I meet this guy it's a drug transaction so I didn't want to deviate from that."  RE 143, Trial

Tr., Vol. II, PageID 1084-85.  Graham moved to strike Allen's testimony as non-responsive, and the district court granted the motion.  After Allen complained that Graham was "trying to twist things up" and would not let him explain why he purchased heroin from McNoriell, the district court instructed Allen to answer Graham's questions and informed him that "the government can ask a follow[-]up question, and they may give you that chance."  *Id.* at PageID 1084.

On redirect, the government asked Allen to explain why he purchased heroin from McNoriell.  Allen replied that dealing drugs is "already a dangerous game," and if he deviated from his regular routine with McNoriell, he "could die, anything could happen."  *Id.* at PageID 1108.  Graham did not object to this line of questioning.  *Id.* at PageID 1108-10.

The government also moved to admit text messages between Bogan and Caldwell, McNoriell's co-conspirators, seized from Caldwell's phone.  In one of the messages, Bogan asked Caldwell to purchase baking soda, "a small Pyrex and a medium size Pyrex," a whisk, and paper towels.  RE 142, Trial Tr., Vol. I, PageID 980.  Falletich testified that these were "items . . . need[ed] to further process narcotics in multiple variations."  *Id.* at PageID 982.  In another message, Caldwell texted Bogan: "I took a big ass risk with my baby and all late at night on the road and still didn't get paid from either and use[d] my gas money."  *Id.*  Falletich testified that he understood this message to show that Caldwell had worked for Bogan before as a drug courier.

McNoriell objected to the text messages as hearsay.  Nonetheless, the district court conditionally admitted the messages as co-conspirator statements and, after the close of evidence, heard argument as to their admissibility under Federal Rule of Evidence 801(d)(2)(e) and *United States v. Enright*, 579 F.2d 980 (6th Cir. 1978).  Graham argued that the statements were inadmissible because the government failed to establish "by a preponderance that there was a conspiracy" and that McNoriell was a member.  RE 143, Trial Tr., Vol. II, PageID 1202.  After analyzing the evidence presented at trial, the district court admitted the text messages, finding that a conspiracy dating back to 2021 existed, McNoriell was a member, and the text messages were in furtherance of that conspiracy.

E.

The jurors found McNoriell guilty on both counts of the indictment and also found each offense involved 500 grams or more of cocaine.  In calculating the Sentencing Guidelines range, the probation office increased its recommended base offense level by two levels due to McNoriell's role as a supervisor.  With a total offense level of 28 and criminal history category IV, McNoriell's recommended guidelines range was 110 to 137 months' imprisonment.

McNoriell objected to the leadership enhancement at sentencing, but the court overruled McNoriell's objection and accepted the probation office's recommendation.  The district court sentenced McNoriell to concurrent prison terms of 110 months for each count.

II.

On appeal, McNoriell argues: (1) the district court excluded him from sidebar conferences in violation of his Sixth Amendment rights to self-representation and to be represented during a critical stage of the proceeding; (2) his indictment was duplicitous; (3) the district court erroneously admitted testimony from Allen suggesting that McNoriell would retaliate against him; (4) the district court erroneously admitted text messages between Bogan and Caldwell; (5) the district court erroneously admitted Falletich's testimony interpreting recorded calls between McNoriell and Allen; and (6) the district court erroneously applied a leadership enhancement at sentencing.  For the reasons discussed below, McNoriell's arguments fail.

A.

McNoriell first argues that his exclusion from sidebar conferences violated his constitutional rights to self-representation and to be represented at critical stages of the proceeding.  As an initial matter, by splitting duties with his standby counsel Graham, McNoriell engaged in a form of hybrid representation.  *See, e.g.*, *United States v. Steele*, 919 F.3d 965, 975 (6th Cir. 2019) (characterizing defendant's request to "question witnesses and otherwise represent himself" while still represented by appointed counsel as a request for hybrid representation); *United States v. Cromer*, 389 F.3d 662, 681-82 (6th Cir. 2004) (describing

scenario where "defendant desires to represent himself in part" as a "case of hybrid representation"). As the parties agree, though, this hybrid arrangement did not change the fact that McNoriell knowingly and voluntarily invoked his right to self-representation. *See Wilson v. Hurt*, 29 F. App'x 324, 328 (6th Cir. 2002) ("[A] trial court must obtain a waiver of the defendant's Sixth Amendment right to have counsel conduct the entire trial before it permits so-called hybrid representation to proceed."); *see also Cromer*, 389 F.3d at 683.

And McNoriell concedes that by invoking his right to self-representation, he necessarily waived the right to counsel. As we have held, "[t]he right to defend pro se and the right to counsel have been aptly described as 'two faces of the same coin' . . . the waiver of one right constitutes a correlative assertion of the other." *United States v. Conder*, 423 F.2d 904, 908 (6th Cir. 1970) (citation omitted).

1.

Because McNoriell did not object to his exclusion from sidebar conferences below, his challenge would typically be subject to plain-error review. *United States v. Hendrickson*, 822 F.3d 812, 825 (6th Cir. 2016). "To show plain error, a defendant must show (1) error (2) that was obvious or clear, (3) that affected defendant's substantial rights and (4) that affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Wallace*, 597 F.3d 794, 802 (6th Cir. 2010). But violations of the rights to self-representation and representation during critical stages of the proceedings are "structural" errors, which are "defect[s] affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *United States v. Barnett*, 398 F.3d 516, 526 (6th Cir. 2005) (quoting *Johnson v. United States*, 520 U.S. 461, 468 (1997)). Structural errors automatically warrant a new trial, "despite the effect of the error on the trial's outcome." *United States v. Simmons*, 797 F.3d 409, 413 (6th Cir. 2015) (citation omitted).

2.

The "right to represent oneself in a criminal trial" is "inhere[nt] in the structure of the Sixth Amendment." *Jones v. Jamrog*, 414 F.3d 585, 591 (6th Cir. 2005). This right is violated in two main ways: when standby counsel impedes a defendant's "actual control over the case he

chooses to present to the jury," or when participation by standby counsel "destroy[s] the jury's perception that the defendant is representing himself." *McKaskle v. Wiggins*, 465 U.S. 168, 178 (1984). But "[a] defendant's invitation to counsel to participate in the trial obliterates any claim that the participation in question deprived the defendant of control over his own defense." *Id.* at 182. So when a pro se defendant agrees to "any substantial participation by counsel, subsequent appearances by counsel must be presumed to be with the defendant's acquiescence, at least until the defendant expressly and unambiguously renews his request that standby counsel be silenced." *Id.* at 183.

Here, the district court allowed McNoriell to engage in a hybrid representation arrangement that closely resembled a co-counsel relationship. Indeed, the district court gave McNoriell wide latitude to use Graham to conduct his defense, which complicates our ability to parse through McNoriell's control over the case and the jury's perception of his representation. McNoriell tasked Graham with delivering the opening statement, cross-examining two of the government's witnesses (including Allen), arguing a motion to exclude the admissibility of co-conspirator statements, and raising relevant objections, a responsibility he shared with McNoriell.

McNoriell also agreed to Graham's participation at sidebar conferences, including during *voir dire*, and failed to object to this participation during trial. To review, at the final pretrial conference, the court assured McNoriell that he would remain "in control" of his representation. RE 142, Trial Tr., Vol. I, PageID 800. Specifically as to *voir dire*, the court explained that if McNoriell had any objections to a juror, he could simply tell Graham, who would convey McNoriell's objections at sidebar. McNoriell, in turn, assured the court—twice—that he had no concerns with this process, which "sound[ed] acceptable" to him. RE 141, Pretrial Conference Hr'g Tr., PageID 771-73. Because McNoriell continued to acquiesce to this arrangement and Graham's participation at sidebar, Graham did not impede McNoriell's control over the case or destroy the jurors' perception that McNoriell represented himself.

Although we have not addressed the specific issue of standby counsel's participation at sidebar conferences, other circuits have found that a pro se defendant's right to self-representation is not violated in these circumstances. For example, in *United States v. Issac*,

655 F.3d 148, 153 (3d Cir. 2011), standby counsel represented the defendant at sidebar conferences where the defendant was not permitted to "move about the courtroom." Because the defendant did not object to standby counsel's representation, there was no violation of his right to self-representation. *Id.*; *see also Lefevre v. Cain*, 586 F.3d 349, 355-57 (5th Cir. 2009) (holding defendant's right to self-representation was not violated where he did not object to standby counsel's representation at sidebar conferences). That reasoning tracks how we have treated a pro se defendant's acquiescence to standby counsel's participation in similar contexts. For instance, in *Hendrickson*, standby counsel examined the defendant using the defendant's own scripted questions, but standby counsel omitted certain questions from the defendant's script, because the defendant previously struggled to answer similar questions and the government had objected to related lines of questioning. 822 F.3d at 826. We found that the defendant's claim of a violation of her right to self-representation was "fatally undercut by the fact that she acquiesced to standby counsel's participation" and failed to object to counsel's conduct or "seek to retake the stand after consulting with counsel." *Id.* at 827-28.

The same reasoning applies here. McNoriell made the knowing decision to represent himself, and he also clearly informed the court that Graham would convey McNoriell's views and objections at sidebar. Under these circumstances, there was no violation of McNoriell's right to self-representation.

3.

Although McNoriell concedes that he waived his right to counsel, he also argues that his "right to be represented during critical stages meant that he, as counsel for the defense, must be present for all sidebar conferences." CA6 R. 24, Appellant Br., at 11. But this argument fails.

"The Sixth Amendment guarantees a right to counsel at critical stages of a criminal proceeding." *Kennedy v. United States*, 756 F.3d 492, 493 (6th Cir. 2014). Although "[g]enerally, standby counsel does not satisfy a defendant's Sixth Amendment right to counsel . . . [t]here is some support for the proposition that in certain circumstances standby counsel can satisfy a defendant's right to counsel if counsel actively and substantially assists the defendant." *King v. Bobby*, 433 F.3d 483, 490 (6th Cir. 2006). Here, with McNoriell's permission, Graham

did exactly that, and this arrangement did not somehow undermine McNoriell's decision to represent himself. "The defendant must make a choice, and he should not be permitted to manipulate his choice so that he can claim reversible error on appeal no matter which alternative he apparently chose in the District Court." *Conder*, 423 F.2d at 908.

Relying on our decision in *United States v. Minsky*, 963 F.2d 870 (6th Cir. 1992), McNoriell claims that "defense counsel's exclusion from *just one* sidebar conference at trial" can violate the right to representation. CA6 R. 24, Appellant Br., at 13 (citing 963 F.2d at 874). But the facts of *Minsky* are inapposite. There, the court conducted an *ex parte* conference with the government, without defense counsel present, to review statements relevant to the defendant's motion under *Brady v. Maryland*, 373 U.S. 83 (1963). *Minsky*, 963 F.2d at 874. Here, in contrast, McNoriell was physically present at the proceeding and consented to an arrangement in which Graham represented McNoriell's interests. Nothing about that arrangement violated McNoriell's Sixth Amendment rights.

4.

In sum, we affirm the district court on this issue. But we take this opportunity to remind district courts that when a defendant invokes his right to self-representation after being warned of the risks of doing so, that choice must be honored. Even when afforded standby counsel, the defendant remains his own attorney, and any adjustments to trial procedures on account of the defendant's self-representation should be made and executed with that principle in mind.

Likewise, district courts would do well to consider the potential consequences before indulging a defendant's requests for free-wheeling hybrid representation. After all, "there is no constitutional right to hybrid representation." *Steele*, 919 F.3d at 975 (quoting *Cromer*, 389 F.3d at 681 n.1). "[W]hether to allow this kind of representation is 'a matter committed to the sound discretion of the trial court.'" *United States v. Green*, 388 F.3d 918, 922-23 (6th Cir. 2004) (quoting *United States v. Mosely*, 810 F.2d 93, 98 (6th Cir. 1987)). If a district court exercises its discretion to allow hybrid representation, the court nonetheless needs to ensure—at each stage of the trial—that any "substantial participation" by standby counsel is done with the defendant's permission. *McKaskle*, 465 U.S. at 183; *see also Faretta*, 422 U.S. at 817 (acknowledging that

"forcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so"). And the record should reflect as much. Otherwise, the court risks allowing the defendant "to manipulate his choice so that he can claim reversible error on appeal no matter which alternative he apparently chose." *Conder*, 423 F.2d at 908.

## B.

McNoriell next argues the indictment improperly alleged two separate conspiracies in a single conspiracy count. He did not make this argument below, so we review for plain error. *United States v. Kakos*, 483 F.3d 441, 445 (6th Cir. 2007).

## 1.

"An indictment is duplicitous if it sets forth separate and distinct crimes in one count." *United States v. Boyd*, 640 F.3d 657, 665 (6th Cir. 2011) (quoting *Davis*, 306 F.3d at 415). Offenses are considered duplicitous if "each requires proof of an additional fact that the other does not." *Davis*, 306 F.3d at 416 (citation omitted). But "the allegation, in a single count of conspiracy, of an agreement to commit several crimes is not duplicitous, as conspiracy is itself the crime." *United States v. Dale*, 178 F.3d 429, 431 (6th Cir. 1999). Thus, "[a] single conspiracy may have as its objective the distribution of two different drugs without rendering it duplicitous." *Id.* Duplicitous indictments are not presumptively invalid; rather, "duplicity is only reversible if it prejudices the defendant." *See United States v. Singer*, 782 F.3d 270, 276 (6th Cir. 2015), *abrogated on other grounds by Musacchio v. United States*, 577 U.S. 237 (2016).

McNoriell challenges the drug conspiracy charge against him and argues that the indictment improperly alleged he trafficked cocaine and heroin as "part of one larger conspiracy." CA6 R. 24, Appellant Br., at 16. The elements of a drug conspiracy are that (1) two or more persons conspired, or agreed, to commit a drug crime; and (2) the defendant knowingly and voluntarily (3) participated in the conspiracy. *See United States v. Williams*, 998 F.3d 716, 728 (6th Cir. 2021). The indictment here charged McNoriell with conspiracy to distribute and possess with intent to distribute 500 grams or more of cocaine and heroin. And like *Dale*, the government here presented evidence "which supported the distribution of both

drugs." *Dale*, 178 F.3d at 431-32. To illustrate, the evidence showed that McNoriell conspired with Allen and other couriers to supply Allen with heroin before Allen's May 15, 2022 arrest and government cooperation agreement, and that McNoriell conspired with Bogan and Caldwell to supply Allen with 500 grams or more of cocaine after Allen withdrew from the conspiracy. This evidence included phone records showing McNoriell sold Allen heroin; recorded phone calls between McNoriell and Allen arranging the June 2022 cocaine transaction; hotel records showing McNoriell reserved a room in Lansing as he planned with Allen; McNoriell, Bogan, and Caldwell's drive to Lansing with the drugs as planned with Allen; the phone calls between McNoriell and Allen, and calls between Bogan and Caldwell after police stopped both vehicles; and testimony from Allen that McNoriell conspired with him and couriers to supply him with heroin, and with Bogan and Caldwell to supply him with cocaine.

McNoriell argues the government alleged one conspiracy that comprised two "separate and distinct" conspiracies involving different substances, co-conspirators, and suppliers. CA6 R. 24, Appellee Br., at 16. Beyond showing "the overlap of a single defendant," he argues, the government "made no effort to detail a heroin conspiracy or connect it to the cocaine conspiracy." *Id.* at 16-17 (citation omitted). But the government elicited testimony from Allen that he purchased heroin from McNoriell approximately ten times from 2021 to 2022, McNoriell had cocaine available for sale before Allen agreed to cooperate with the government, and McNoriell used couriers to deliver heroin. A conspiracy is not converted into multiple conspiracies "simply because each member of the conspiracy did not know every other member, or because each member did not know of or become involved in all of the activities in furtherance of the conspiracy." *United States v. Beals*, 698 F.3d 248, 259 (6th Cir. 2012) (citation omitted). There was no duplicity problem here.

2.

Even assuming the indictment was duplicitous, McNoriell cannot show prejudice. McNoriell argues the indictment infringed on his right to jury unanimity. But "proper jury instructions can mitigate the risk of jury confusion and alleviate the doubt that would otherwise exist as to whether all members of the jury had found the defendant guilty of the same offense." *United States v. Lloyd*, 462 F.3d 510, 514 (6th Cir. 2006).

Here, the district court instructed the jurors that they "should not find Mr. McNoriell guilty of the conspiracy that is charged in count one of the indictment based on an agreement between Michael Allen and Mr. McNoriell occurring on or after May 15, 2022"—when Allen became a DEA cooperator.  RE 144, Trial Tr., Vol. III, PageID 1283.  But the jurors were allowed to consider any "agreement between Michael Allen and the defendant before Michael Allen became a DEA cooperator," and "any agreement that the defendant may have had with others after May 15, 2022." *Id.*  During deliberations, the jurors asked the district court if they could consider "the evidence of the heroin transaction on May 26th" between McNoriell and Allen "as evidence in count one since Michael Allen was a [confidential informant] prior to that day." *Id.* at PageID 1332.  The district court responded that they "should consider all of the instructions that [the court] gave . . . earlier" and "consider them together as a whole." *Id.*

McNoriell points to this exchange as evidence that "at least one juror believed it was necessary to rely on an alleged heroin transaction" to find him guilty of a conspiracy to distribute and possess with intent to distribute both cocaine and heroin.  CA6 R. 24, Appellant Br., at 18-19.  But "[j]uries are presumed to follow the instructions they are given." *Davis*, 306 F.3d at 416.  And the jurors unanimously held McNoriell accountable for 500 grams or more of cocaine as part of the conspiracy.  McNoriell argues "the jury simply filled out the paperwork provided to it.  The jury had no other option."  CA6 R. 37, Reply Br., at 8.  But the jurors did have another option—to vote not guilty.  McNoriell cannot show the indictment prejudiced him.

C.

McNoriell also argues the district court erroneously admitted character evidence by allowing Allen to testify on cross-examination that being with McNoriell put him "in danger" and then on re-direct that he "could die" by informing on McNoriell.  CA6 R. 24, Appellant Br., at 23 (quoting RE 143, Trial Tr., Vol. II, PageID 1084, 1108).  But Allen's testimony was neither improper character evidence nor prejudicial.

As an initial matter, McNoriell did not object to Allen's testimony as improper character evidence.  Instead, he moved to strike Allen's testimony on cross-examination as non-responsive to his pending question.  The district court granted McNoriell's motion and instructed the jury

"not to consider [Allen's] unsolicited response." RE 143, Trial Tr., Vol. II, PageID 1084-85. Then, when the government elicited similar testimony from Allen on re-direct, McNoriell failed to object. Because McNoriell did not object to Allen's testimony on the same grounds he now raises on appeal, we review for plain error. *United States v. Evans*, 883 F.2d 496, 499 (6th Cir. 1989). Also, because the district court struck Allen's testimony on cross-examination, we review only Allen's testimony on re-direct. *See Davis*, 306 F.3d at 416 ("Juries are presumed to follow the instructions they are given."). On re-direct, Allen explained that he purchased heroin from McNoriell during their May 26, 2022 meeting because dealing drugs was "already a dangerous game," and if he "deviate[d] from [his] regular routine . . . [he] could die, anything could happen" because McNoriell might suspect "something ain't right." RE 143, Trial Tr., Vol. II, PageID 1108-09.

The government cannot introduce evidence of a defendant's character until the defendant "open[s] the door by offering evidence as to his good character." *United States v. McGuire*, 744 F.2d 1197, 1204 (6th Cir. 1984) (citation modified). Here, Allen's testimony was elicited not to comment on McNoriell's character, but rather to explain why Allen purchased heroin from McNoriell notwithstanding his agreement with the DEA to refrain from committing further crimes. And his testimony depicted the dangerous nature of drug dealing. To the extent Allen described McNoriell, he did so to identify McNoriell as a participant in "a dangerous game." RE 143, Trial Tr., Vol. II, PageID 1108. The district court did not err, plainly or otherwise, in allowing this evidence.

But even assuming Allen's testimony constituted improper character evidence, McNoriell cannot show prejudice because there was plenty of other evidence of his guilt. *See United States v. Prather*, 138 F.4th 963, 972 (6th Cir. 2025) (finding that the defendant could not "surmount plain-error review" or "show prejudice" from improper character testimony "[g]iven the overwhelming evidence against [the defendant]"). This evidence included phone records and texts with Allen arranging the drug deal, evidence of McNoriell's drive to Lansing with Bogan and Caldwell, records reserving the Lansing hotel room in McNoriell's name, and a cooperating witness's testimony describing the drug deal. Admission of Allen's testimony as to the dangerous nature of drug dealing was not plain error.

D.

McNoriell next argues the district court erred by admitting text messages between Bogan and Caldwell because the statements were hearsay not made in furtherance of the conspiracy. The district court properly admitted these messages under the co-conspirator hearsay exception.

Where a defendant has preserved the issue on appeal, like here, we review the admission of evidence by the trial court for abuse of discretion. *United States v. Dunnican*, 961 F.3d 859, 871 (6th Cir. 2020). "[E]ven if an abuse is found, a new trial is not required unless the defendant's 'substantial rights' were affected by the admission of the evidence." *United States v. Munguia*, 273 F. App'x 517, 520 (6th Cir. 2008) (citation modified). "[T]he phrase 'affect substantial rights' is generally synonymous with 'prejudicial,' which *usually* means that the error must have affected the outcome of the district court proceedings." *Barnett*, 398 F.3d at 526 (citation omitted).

A statement is not hearsay if it "was made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). To admit such statements, the court must conclude "that: (1) the conspiracy existed; (2) the defendant was a member of the conspiracy; and (3) the co-conspirator made the proffered statements in furtherance of the conspiracy." *United States v. Warman*, 578 F.3d 320, 335 (6th Cir. 2009). "This three-part test is often referred to as an *Enright* finding." *United States v. Wilson*, 168 F.3d 916, 920 (6th Cir. 1999) (citing *Enright*, 579 F.2d at 986-87).

McNoriell seemingly takes issue with two sets of messages. First, McNoriell points to December 2021 messages from Bogan to Caldwell asking Caldwell to purchase baking soda, "a small Pyrex and a medium size Pyrex," a whisk, and paper towels, items that Falletich testified are used to "process narcotics in multiple variations." RE 142, Trial Tr., Vol. I, PageID 980, 982. Second, McNoriell points to a January 2022 message from Caldwell to Bogan saying "I took a big ass risk with my baby and all late at night on the road and still didn't get paid from either and use[d] my gas money," which Falletich understood to mean that Caldwell had worked for Bogan before as a drug courier. *Id.* at PageID 982.

The district court properly admitted the text messages under *Enright*. 579 F.2d at 986-87. The government introduced ample evidence showing Bogan, Caldwell, and McNoriell were in a conspiracy to distribute and possess drugs, satisfying the first two *Enright* factors. *Id.* This evidence included the group's trip to Lansing with the drugs as planned with Allen, McNoriell's reference to a female courier, the phone calls between McNoriell and Allen, and calls between Bogan and Caldwell after police stopped both vehicles. The texts also satisfied the third *Enright* factor because they were made in furtherance of the conspiracy. *Id.* The texts, sent within the charged conspiracy's date range, show Bogan directing Caldwell to purchase materials to distribute drugs and discussing a previous courier trip.

McNoriell argues these messages "were made as part of a separate conspiracy" in the "months before the charged conspiracy." CA6 R. 24, Appellant Br., at 26. But we have long held that "[w]hen two or more persons are shown to have been engaged in the same unlawful conspiracy . . . it is not necessary to prove the knowledge by one of the dealings, or even of the existence, of the others" to "render evidence of the actions of those others admissible against that person." *Poliafico v. United States*, 237 F.2d 97, 104 (6th Cir. 1956). "A single conspiracy is not converted to multiple conspiracies simply because it can be subdivided, or because there are changes in the individuals involved or the roles that they play in the conspiracy." *United States v. Beals*, 698 F.3d 248, 259 (6th Cir. 2012) (citation omitted). McNoriell's argument runs afoul of these principles.

Moreover, we have found similar co-conspirator statements admissible. For instance, in *United States v. Adamo*, 742 F.2d 927 (6th Cir. 1984), *abrogated on other grounds by Buford v. United States*, 532 U.S. 59 (2001), we affirmed the admission of statements from an untried co-conspirator and a testifying co-conspirator regarding the distribution of marijuana that did not involve the defendant. 742 F.2d at 943. The statements occurred during the charged conspiracy's time frame and were "part and parcel of the general on-going drug conspiracy of which the appellants were members." *Id.* Here, too, the messages between Bogan and Caldwell were sent during the conspiracy's time frame and were "part and parcel" of the conspiracy, even if McNoriell was not involved in the specific transactions discussed.

For these reasons, the district court did not abuse its discretion in admitting statements from McNoriell's co-conspirators. But even if the district court did abuse its discretion, McNoriell cannot show his substantial rights were affected because, for the same reasons described above, the government introduced sufficient independent evidence of McNoriell's guilt. *See United States v. Young*, 553 F.3d 1035, 1047-48 (6th Cir. 2009).

E.

McNoriell argues for the first time on appeal that the district court improperly allowed Falletich to testify to the significance of recorded communications between McNoriell and Allen. We review this claim for plain error. *See Underwood*, 859 F.3d at 394.

When not testifying as an expert, a witness's "testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of [Fed. R. Evid.] 702." Fed. R. Evid. 701. "The purpose of lay opinion testimony is to describe something that the jurors could not otherwise experience for themselves by drawing upon the witness's sensory and experiential observations that were made as a first-hand witness to a particular event." *United States v. Young*, 847 F.3d 328, 350 (6th Cir. 2017) (citation modified).

A law enforcement officer may testify as a lay witness about a conversation "only when the law enforcement officer is a participant in the conversation, has personal knowledge of the facts being related in the conversation, or observed the conversations as they occurred." *Id.* (quoting *United States v. Kilpatrick*, 798 F.3d 365, 379 (6th Cir. 2015)). When reviewing a challenge to law enforcement testimony interpreting "ordinary English" from recorded phone calls, courts consider "whether the officer testified based on specific personal experience and whether the jury was unequipped to arrive at the same opinions and conclusions." *United States v. Reed*, 163 F.4th 338, 357 (6th Cir. 2025) (citation modified). As to the first factor, "direct involvement in an investigation and specifically with the interpreted conversations may be sufficient to establish personal experience." *Id.* And as to the second, an officer cannot "divine

what vague, plain English language means," because "[t]hese types of conclusions are the province of a jury." *United States v. Freeman*, 730 F.3d 590, 598 (6th Cir. 2013).

Here, Falletich did not merely interpret plain English but assisted "the jury in understanding from a percipient witness'[s] point of view what the communications signaled to law enforcement." *Reed*, 163 F.4th at 358. Considering that Falletich listened to the conversations as they happened and directed Allen's responses, Falletich permissibly testified to his "personal knowledge of the facts being related in the conversation." *Kilpatrick*, 798 F.3d at 379 (citation omitted).

McNoriell cites *Freeman* in support of his argument that the district court erred in allowing Falletich to testify as a lay witness. But *Freeman* does not help McNoriell. There, an FBI agent testified to his interpretations of recorded phone calls with the defendant without explaining how he reached his conclusions, based only "on the general knowledge of the FBI and the investigation as a whole." *Freeman*, 730 F.3d at 596. Unlike Falletich, the agent "did not testify to being present for the surveillance [that led to these calls], or even to observing any activity relevant to interpreting the calls." *Id.* at 597. McNoriell cannot show any error here, much less plain error.

F.

Finally, McNoriell argues the district court erred at sentencing when it applied a leadership enhancement under U.S.S.G. §3B1.1(c). "We review a sentence's reasonableness for abuse of discretion," the supporting factual findings for clear error, "and the conclusion that a person is an organizer or leader under [§]3B1.1 deferentially." *Reed*, 163 F.4th at 369. "Under the clear-error standard, we abide by the court's findings of fact unless the record leaves us with the definite and firm conviction that a mistake has been committed." *United States v. Sexton*, 894 F.3d 787, 794 (6th Cir. 2018) (citation omitted).

The guidelines provide for a two-level leadership enhancement if "the defendant was an organizer, leader, manager, or supervisor in any criminal activity." U.S.S.G. §3B1.1(c). In making this determination, the court considers factors such as the defendant's "exercise of decision-making authority," "recruitment of accomplices," "the degree of participation in

planning or organizing the offense," and "the degree of control and authority exercised over others." *Id.* §3B1.1(c) cmt. 4. But "[a] district court need not find each factor in order to warrant an enhancement." *United States v. Castilla-Lugo*, 699 F.3d 454, 460 (6th Cir. 2012). "[T]he enhancement is not appropriate when the individual acted merely as a 'middleman' or as a supplier," but "the enhancement is proper when the defendant's actions exceed those of a middleman or supplier, such as when a drug dealer takes an active role in directing the delivery of the cocaine." *United States v. Watson*, 117 F.3d 1421, at *5 (6th Cir. 1997) (per curiam) (unpublished table decision).

We have found that a defendant takes an "active role in directing" a drug deal when he coordinates with others to complete the transaction. For instance, in *United States v. Munoz*, 233 F.3d 410 (6th Cir. 2000), we upheld a leadership enhancement where the defendant "worked out the [drug] deal with the informant, made arrangements for the courier to deliver the drugs," "was in repeated contact with the informant[,] and played a role in coordinating both the delivery of and payment for the [drugs]." 223 F.3d at 416. Likewise, in *United States v. Minter*, 80 F.4th 753 (6th Cir. 2023), we affirmed the district court's application of a leadership enhancement where the defendant determined "where and when to meet . . . to deliver the drugs," had "consistent, repeated contact with the couriers throughout the conspiracy," and received a larger payment than his co-conspirators for the transaction. 80 F.4th at 758-59.

Here, as in those cases, McNoriell's actions exceeded those of a middleman. He organized the June 2022 cocaine deal by coordinating with Bogan and Caldwell to transport the drugs; setting the location and manner of the transaction (when he directed Allen to meet him in the Lansing hotel room); engaging in consistent contact with the couriers throughout the conspiracy; and driving with Bogan and Caldwell to Lansing. Under these facts, the district court did not abuse its discretion or clearly err in applying the two-level leadership enhancement.

III.

For these reasons, we affirm the district court's judgment.